## EX PARTE JIM TAYLOR.

*No. 857.   Decided October 17.*

**Murder—Habeas Corpus to Obtain Bail—Threats Alone by Deceased Against Defendant no Ground for Admission to Bail.**—On a hearing upon habeas corpus for bail after indictment for murder, where it was insisted that applicant was entitled to bail because of proof of threats by deceased against his life, which he had good reason to believe would be carried into execution, *Held*, not maintainable; because:

1. It is from circumstances attending the killing that malice is inferred, without reference to the actual or precise motive, whether of hatred, fear, or gain, with which the act was done.

2. The right of self-defense can not be invoked by the fears of the person defending; there must be a reasonable appearance of danger to call it into exercise.

3. A belief and fear that deceased designed to kill accused will not prevent his homicide by the latter from being murder, unless he did some act reasonably calculated to induce the belief that the threatened attack had then commenced to be executed, and was not a mere preparation for some future act.

4. Mere antecedent threats can not become a provocation sufficient to extenuate or mitigate a homicide.

5. Threats may create fear, but the doctrine can never be tolerated that under the influence of that fear one may with legal sanction become an assassin.

APPEAL from the District Court of Shelby. Tried below before Hon. DRURY FIELD, Special Judge.

On the 16th day of June, 1894, appellant killed one Jim Williams, in the village of Joaquin, Shelby County, Texas, by shooting him twice with a double-barrel shotgun. He was indicted for said murder by the grand jury of Shelby County on the 13th day of July, 1894, and on the 14th of July he applied to the Hon. Drury Field, special

judge presiding, for a writ of habeas corpus, which, being granted, was heard by said judge on the 20th of August, and bail refused.

The evidence, as to its important particulars, briefly summed up, is substantially: That some few weeks prior to the killing the cotton gin of one Dick Hinson, in the neighborhood where the deceased (Williams) lived, had been burnt. Williams (the deceased) had been informed that the relator, James Taylor, and a youth, one Gus Wallace, had accused him of setting fire to and burning said gin. He was greatly enraged upon hearing of this accusation, and some short time before the killing had met Wallace in a livery stable at Logansport, had slapped his jaws, and otherwise maltreated him. That before and at that time he threatened to kill the relator (Taylor); declared that he intended to shoot him. These threats were communicated to relator. It was also proved that deceased was a dangerous man, and one likely to execute a threat made by him. A primary election was to be held in the village of Joaquin on the 16th of June. About 8 a. m. Taylor reached the village, carrying a double-barrel shotgun and a six-shooter. He placed his shotgun behind the door in Rushing's store. About half-past 10 or 11 o'clock Taylor and one Smith started from the front of Rushing's store to go to the brush, a short distance away. When they had gone some thirty or forty yards they saw the deceased (Jim Williams) coming up on horseback in the direction of the store. Taylor immediately turned, went back, and entered the front door of the store; and in a few moments emerged from a side door with his gun in hand, and turned round the corner of the store, going in the direction Williams had gone.

What transpired afterwards is concisely told by the witness R. A. Truit, who testified, he was in the town of Joaquin on the 16th day of June, A. D. 1894, in Shelby County, Texas, standing on the northwest corner of the gallery to Mr. Rushing's storehouse; that about 11 o'clock Mr. J. M. Williams rode up to a little pine tree standing about five or six yards from the southwest corner of Rushing's storehouse, stopped his horse and dismounted, took his halter in his right hand, approached the small pine tree, reached up with his right hand, putting the halter around the tree, and reached up to take the end of the halter with his left hand. Just at that time witness saw Jim Taylor come around the southwest corner of the Rushing storehouse and step about two steps down the side of the store, and raised a shotgun, which he held in his hand, to his face, and fired at Williams; that Williams uttered a pitiful moan and fell back on his elbows, when Jim Taylor moved a step or so towards him and fired a second shot at him; that Williams was down on the ground when Taylor fired the second shot; that deceased was in the act of tying his horse when he was shot the first time, and was standing about one yard in front of his horse at the pine tree, with both hands up as if in the act of tying his horse to the little pine tree,

when shot by Taylor; that Taylor pointed his gun downward when the second shot was fired; that the deceased was in his shirtsleeves, that is, he had on a shirt, vest, and pants; that witness went to the body of Williams immediately after he was shot, and he was dead; had two large wounds, one in the right breast and the other in the left breast; that he saw the doctor put his hand into the wounds; that they were very large.

This testimony of Truit is in the main corroborated by most of the other witnesses.

One or more witnesses for relator testified, that relator accosted deceased, and deceased made some movement as if to reach his saddlebags, which were across his saddle, before relator fired; and one witness testified to seeing a pistol in the saddle-pockets after the killing. Other witnesses testified, that deceased had no pistol, and that there was none in the saddle-pockets. As explanatory of relator's bringing his gun to town, it was proved that he was going to camp out in the river bottom on a fishing expedition of several days.

The bill of exceptions reserved by the relator to the ruling of the court in excluding evidence offered by him, is as follows: Relator offered to prove by the witnesses Sam Lawrence, Joe Finley, Byron Brown, Perry Donohoe, and others, that up to the 9th day of June, A. D. 1894, Gus Wallace lived in Shelby County, and in the portion thereof lying upon Sabine river, and contiguous to the town of Logansport, as also did deceased and relator. That after the reported trouble between deceased and said Gus Wallace in the livery stable in the town of Logansport, as stated in the testimony of Sam Lawrence, on said 9th day of June, A. D. 1894, the said Gus Wallace suddenly and on said day disappeared from the community in which he had up to said time lived. That the people living in said community were alarmed at the disappearance of said Wallace, and made search and inquiry in vain for him during all of the week beginning on said 9th and ending on the 16th day of June, A. D. 1894, the day Williams was killed. That it was generally believed by the people living in said community that deceased had killed and secreted the body of said Gus Wallace, and this belief was prevalent at the time the deceased was killed, no tidings having been received from or of said Wallace by any one at said time. Said testimony being offered in connection with the testimony of Byron Brown, Joe Finley, and Sam Lawrence, each of whom testified to a state of facts showing that deceased accused relator and Gus Wallace of doing one and the same thing—the burning of Dick Hinson's gin house—and that his animosity was as much against one as the other; and that the names of relator and Gus Wallace were always used in connection one with the other by deceased at the time, and upon all the accusations, when he made threats, to which said witnesses last mentioned testified, and to which refer-

ence is made in support of the pertinency and relevancy of the excluded testimony; and the State objected to the admission of said proposed testimony when offered, upon the following grounds, to wit, that the same was immaterial and irrelevant; and the court sustained said objection, and excluded said testimony.

*Tom C. Davis, John P. Garrison,* and *Hugh B. Short,* for relator.— The court erred in not permitting the relator to show, by the testimony of the witnesses Sam Lawrence, Joe Finley, Perry Donohue, and others, that the week before, and up to the time of the killing, one Gus Wallace had disappeared from the neighborhood, and that it was the general belief of the neighborhood that the deceased, J. M. Williams, had killed the said Wallace, as is shown by bill of exception number 1.

This testimony was clearly admissible: first, to show the condition of the relator's mind, and that it was not sedate and deliberate; second, to show the standpoint from which the relator acted, and to disprove express malice

The court erred in refusing bail under the admitted testimony in the case. The rule in cases like this is announced in the case of Ex Parte Smith, 23 Texas Criminal Appeals, 135: "If the evidence is clear and strong, leading a well-guarded and dispassionate judgment to the conclusion that the offense has been committed, that the accused is the guilty agent, and that he would probably be punished capitally, if the law is administered, bail is not a matter of right." "It is for the judge or court who hears the testimony to consider the evidence as a whole, and if by the entire evidence a reasonable doubt of the appellant's guilt is not generated, the proof is evident, and bail should be denied." Id., 127.

In the case of Ex Parte Boyette, 19 Texas Criminal Appeals, 17, it is said that the word evident, used in the Constitution and statute in reference to bail, means, "manifest," "plain," "clear," "obvious," "apparent," "notorious," "evidently," "in an evident manner," "clearly," "obviously," "plainly." Now, unless it plainly, obviously, clearly appears by the proof that the relator is guilty of murder in the first degree, then under the Constitution he is entitled to bail.

That there is evidence in the case that would warrant the court in sustaining a conviction of murder in the first degree is not the test. This was once the rule, as declared in the Beacom case, 12 Texas Criminal Appeals, 318; but this case and the rule as therein stated is expressly overruled in Smith's case, 23 Texas Criminal Appeals, 135.

Is this a killing upon express malice? The relator uttered no threat, and had no malice against the deceased, if the record is to be believed. The deceased, on the contrary, did make threats, did have malice against the relator, and was a violent and dangerous man, likely to execute

the threats just previously made at the first opportunity. Under this uncontradicted evidence, what office do threats perform? This question is answered, in the opinion of this court rendered in Howard's case, 23 Texas Criminal Appeals, 265, in which article 608 of the Penal Code is discussed and construed. In that opinion this court uses this language: "To justify homicide, an overt act, evincing an intent or purpose to carry out his threat, must be established. But where a defendant does not claim complete justification, but seeks only to show the standpoint from which he acted, are not such threats admissible to throw light upon his act and to mitigate his offense? * * * They may not justify, and still they may mitigate the offense." The office, then, which these threats of themselves and per se perform, is to mitigate the offense, not the punishment attached to the offense, and to rebut the presumption of express malice arising from the charge, according to the opinion of the majority of the court in the Smith case, provided of course they are of sufficient weight to have this effect. That these threats, viewed from the relator's standpoint, are of the most serious and weighty character does not admit of question or discussion, and their existence not being disputed, it follows that the inculpatory facts show at most a killing upon implied malice, the relator to be guilty of murder in the second degree, and, as a matter of right, to be entitled to bail. Under the testimony of some of the witnesses introduced by the State, a case of murder in the second degree is presented; under the testimony of others, it is manslaughter; while the witnesses for relator show a justifiable homicide. Under every phase as made by the evidence, the case is a bailable one. Ex Parte Hay, 23 Texas Crim. App., 585.

No brief on file for the State.

SIMKINS, JUDGE.—Appellant was indicted for the murder of one J. M. Williams, in Shelby County, and filed his petition for bail before the Hon. Drury Field, Special Judge. This is an appeal from the refusal of said special judge to grant bail as prayed for.

Appellant contends that he is entitled to bail upon the proposition that he had established by proof that threats were made by the deceased against his life, which threats he had good reason to believe would be carried into execution. Such proof, if not available as justification of the homicide, would certainly extenuate it, even though consummated premeditately and deliberately. It was insisted in argument that the motive for the homicide, being the protection of his life from serious danger, could not be deemed a wicked or malicious motive, and such homicide should not be held to be of express malice, and therefore nonbailable. This question was considered to some extent in Lander v. The State, 12 Texas, 475, and it was denied that any

such effect could be given to previous threats.   This conclusion has never been questioned in this State, for we do not regard the case of Howard v. The State, 23 Texas Criminal Appeals, 278, as doing so. The proposition contended for is apparently based on a misunderstanding of the term "malice" as used in law, which does not necessarily involve a vicious and wicked motive, but is applied to any willful transgression of law.   Law is practical.   It deals with material facts, rather than with immaterial ones.   It therefore regards not so much the act of killing as the particular manner or modes of killing, which must always be alleged and proved.   Whart. Crim. Ev., 738.   It is from circumstances attending the killing that malice is inferred, without reference to the actual or precise motive, whether of hatred, fear, or gain, with which the act was done.   In fact, in cases of homicide, motive of any kind is usually shown to throw light upon the condition of the mind at the time when the crime was consummated or determined upon; for the question in every homicide is, what was the condition of defendant's mind? was it calm and sedate, and with a formed design? and not, what particular motive led to such design?   A motive to take life, however powerful, which does not render the mind incapable of cool reflection, can not reduce a deliberate homicide below murder in the first degree.   Indeed, if motive is to govern in determining the degree of crime, it would make no difference how deliberately or cruelly the killing was effected, whether by lying in wait, by poison, starving, or torture, which by our code and by all law is held to be murder upon express malice; and there would be no homicide which might not be reduced to murder in the second degree, or even to excusable or justifiable homicide, and human life and safety would be at the mercy of cowardice and perjury, and the floodgates of crime thrown wide apart.   Now, the object in introducing threats is to show that the threatened party acted in self-defense.   But to make them available for such purpose, the code declares it must be shown at the time of the homicide that the person killed by some act then done manifested an intention to execute the threats so made.   Penal Code, art. 608.   When, therefore, the circumstances of the killing absolutely negative the suggestion that the deceased was immediately about to execute such threat, it is not error to exclude threats altogether.   Penland's case, 19 Texas Crim. App., 365; Lynch's case, 24 Texas Crim. App., 364, 365.   While the law of self-defense rests upon the law of necessity, and can not be abrogated by any law, yet it has well-defined limitations, marked out by human experience.   Thus this right can not be invoked by the fears of the person defending, but the law requires that there must be a reasonable appearance of danger to call it into exercise.   The belief and fear that a person designs to kill me will not prevent my killing him from being murder unless he does some act reasonably calculated to induce the belief that the threatened attack

had then commenced to be executed, and was not a mere preparation for some future act. McDade's case, 27 Texas Crim. App., 687; Penland's case, 19 Texas Crim. App., 365; Lynch's case, 24 Texas Crim. App., 364; Irwin's case, 43 Texas, 236. But in exploring all sources that may throw light on the conduct of the parties at the time of the killing, threats should ordinarily be admitted to illustrate or explain the conduct of the deceased which may have led to the homicide. An act otherwise of no special significance would, in the light of previous threats, become pregnant with danger to a reasonable mind, and justify the taking of life. But howsoever available they may be in self-defense, yet mere antecedent threats can not become a provocation sufficient to extenuate or mitigate a homicide. Johnson's case, 27 Texas, 758; Irwin's case, 43 Texas, 236; Sims' case, 9 Texas Crim. App., 586–595. Being uttered before the meeting of the parties, and frequently days before, ample opportunity and time are afforded for resort to the proper tribunals to invoke the protection of the law; and such are the requirements of the law and the dictates of good citizenship. But certainly threats can never be invoked in extenuation of crime, where the killing is deliberate. The law will never concede the proposition that one may waylay his enemy with a mind incapable of cool reflection. It is true threats may create fear, but the doctrine can never be tolerated that under the influence of that fear one may, with legal sanction, become an assassin. The peace and safety of society forbid such a conclusion. ·

We do not wish to discuss the evidence in this record, but after a careful investigation of the same we can see no reason to reverse the ruling of the court below, and the judgment of that court is affirmed.

*Affirmed.*

Judges all present and concurring.