## HENRY RODGERS HARDEMAN v. THE STATE.

### No. 892.  Decided January 11, 1911.

### Rehearing Denied February 8, 1911.

**1.—Murder—Charge of Court—Manslaughter—Threats.**

Antecedent threats will not reduce a homicide to manslaughter; and, where upon trial of murder, the evidence showed that the only thing that defendant claims deceased did at the time of the homicide was to refuse to come out of the house at defendant's request, and when the deceased appeared in the door defendent shot and killed him, and that this occurred at night and that defendant attempted to conceal his identity, the issue of manslaughter was not raised and a conviction of murder in the first degree assessing the death penalty is sustained.

**2.—Same—Plea of Guilty—Express Malice.**

Where, upon trial of murder, defendant entered a plea of guilty to an unlawful killing, hoping to reduce the grade of the offense to a less degree than that of the first degree and relied on some previous trouble between deceased and himself, but the evidence showed a killing upon express malice, the conviction of murder in the first degree is sustained.

**3.—Same—Evidence—Collateral Matters.**

Where, upon trial of murder, the State had admitted that deceased and a certain woman were criminally intimate, there was no error in refusing to admit testimony showing this matter.

**4.—Same—Evidence—Self-Serving Declarations—Threats.**

Self-serving declarations of the defendant are not admissible, and where, upon trial of murder, the court rejected testimony as to the statement made by the defendant to the witness a day or two before the killing as to the threats deceased had made against him, but the proof showed that the defendant shot and killed deceased in the door of his house at the dead hour of night, there was no error.

Appeal from the District Court of Bastrop.  Tried below before the Honorable Ed R. Sinks.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*R. M. Wynne* and *Baskin, Dodge & Baskin,* for appellant.—Upon the court's failure to instruct on manslaughter: Jones v. State, 28 Texas Crim. App., 338, 15 S. W. Rep., 403; Moore v. State, 15 Texas Crim. App., 1; Hobbs v. State, 16 Texas Crim. App., 517; Neyland v. State, 13 Texas Crim. App., 536; Arnwine v. State, 49 Texas Crim. Rep., 5; Black v. State, 38 Texas Crim. Rep., 58; Riojas v. State, 8 Texas Crim. App., 49; Halbert v. State, 1 Texas Crim. App., 656; Hill v.

State, 5 Texas Crim. App., 2; Howard v. State, 23 Texas Crim. App., 265.

Upon the question of rejecting evidence as to conduct of deceased, etc.: Sec. 10, Bill of Rights, art. 24; Cline v. State, 36 Texas Crim. Rep., 320, 36 S. W. Rep., 1099.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—This appeal is prosecuted from a judgment of conviction for the offense of murder had in the District Court of Bastrop County, Texas, on the 8th day of July, 1910.

1. Bill of exceptions No. 1, and the first ground of the motion for a new trial, raises the only serious question in the case; that is, the failure of the court to submit the issue of manslaughter in his charge to the jury. There is no complaint that the court did not properly submit the issues of murder of the first and second degree, but the contention is made that the evidence raises the issue of whether or not the killing was done under the influence of sudden passion aroused from an adequate cause. The evidence discloses that appellant and deceased were both on familiar terms with a colored woman named Claudia Alexander and that they were not on friendly terms with each other. The evidence for the State shows that on the day of the homicide the defendant borrowed a cap, shoes and a gun from his neighbors, and bought at a nearby store shells containing buckshot; that after dark he (owning horses of his own) stole a horse from an adjoining pasture, and rode nine miles to the town of Bastrop. When he got to the town of Bastrop, apparently not knowing the exact location of deceased's home, he called at Oscar Pfeiffer's home about 9 or 10 o'clock at night and asked the way to deceased's house, stating that he desired to get deceased to carry a bundle to the sawmill next morning, where deceased worked, not giving his right name, and stating that his name was Black. When appellant got to deceased's house he called, and deceased's wife answering him, he stated he desired to get deceased to carry a bundle to the sawmill. Deceased, being in bed, called his son and told him to go and get the bundle, deceased going only to the front door, when he was shot, the bullets striking him in the chest and stomach. Defendant testified in his own behalf, and testified that there was ill-will between deceased and himself, and that they had several wordy altercations; that on the day before the killing deceased met him in the town of Bastrop, and had told him that he must remain out of town or he would kill him. He admitted that he had borrowed the cap, shoes and gun (stating that he desired to go hunting), stole the horse and purchased the shells, and went to the home of deceased at about nine o'clock at night, claiming that he did so for the purpose of talking with him and seeing if their differences could not be adjusted, and borrowed the gun and bought the shells that day to protect himself if it became necessary. That he called deceased and asked

him to come out—that he desired to talk to him. That deceased came to the door, but would not come out, and began to back in the house, when he shot him, thinking he was going in the house after a weapon. He also states that deceased had threatened his life on several occasions, and further testifies: "I thought if a man threatened my life, and continually threatened it, and showed to you by all means, manifesting all kinds of interest in you to kill you, I thought one man has as much right as another." Defendant on cross-examination stated in answer to a question: "Yes, sir, when I borrowed the gun Thursday morning I borrowed it to kill Sam Colter (deceased) with," later qualifying this statement and stating, "I bought the cartridges with the intention of reasoning with Sam."

Admitting the statements of defendant to be true, that on several occasions prior to the night of the homicide deceased had threatened his life, and that he had "killed deceased because of these threats, and he had reached the point where he could not sleep or rest during the night," this would not reduce the homicide to manslaughter. Antecedent threats will not reduce a homicide to manslaughter. Eggleston v. State, 128 S. W. Rep., 1105; Ex parte Taylor, 33 Texas Crim. Rep., 531; Brooks v. State, 24 Texas Crim. App., 274; Davis v. State, 35 S. W. Rep., 388; McDade v. State, 27 Texas Crim. App., 641. Outside of these antecedent threats, testified to by defendant, the only thing that appellant claims deceased did was to refuse to come out of the house at his request. If such facts are true, it would not be such conduct as would be calculated to arouse such passion as to render the mind incapable of cool reflection.

2. By bills of exception Nos. 2 and 4 the appellant complains that the court erred in refusing to admit testimony showing that deceased and Claudia Alexander were criminally intimate. The court qualifies the bill by stating that the State admitted before the court and jury that the deceased, Sam Colter was criminally intimate with the wife of the witness, Lucius Alexander, and the statement of facts shows this to be true.

3. By bill of exception No. 3 the appellant complains that the court erred in not permitting the witness Joe Spooner to testify to statements made to him by appellant a day or two before the killing. Self-serving declarations are not admissible, but we fail to see in what way the statement would have been of benefit to the appellant. By the bill it is stated that he proposed to prove by said witness, "That he (appellant) told the witness that deceased had repeatedly threatened his life, and that he was afraid to ride home in his own wagon, and that he was trying to arrange his business so as to move to Fort Worth." Admit this to be true, yet it would not authorize appellant a day or two thereafter to attempt to conceal his identity by borrowing different articles of clothing to wear; to borrow a shotgun, buy buckshot, steal a horse, ride nine miles to deceased's house, call him to

his door, and in the dead hour of night shoot him down, even though he did "back in his door" when invited to come out.

This being a conviction for murder in the first degree, with the death penalty assessed, we have carefully reviewed every question raised, but, finding no error, the judgment is affirmed.

*Affirmed.*

Prendergast, Judge, not sitting

### ON REHEARING.

#### February 8, 1911.

HARPER, JUDGE.—At a former day of this term this case was affirmed, and appellant has filed a motion for rehearing. We have again carefully and thoughtfully gone over the record. In this case the jury assessed the death penalty, and if the facts did not justify the finding, or if the court had failed to submit any issue made by the evidence, defendant should be granted a new trial. But the defendant entered a plea of guilty to an unlawful killing, and stated in open court that all he hoped to do was to reduce the grade of offense to a less degree than murder in the first degree. The only fact relied on by appellant to do this was the previous trouble between deceased and himself, and when he had ridden nine miles at night in search of deceased, and when he called him to his door, upon deceased learning who it was that called him, deceased backed in his house. There is no testimony that deceased made any remark or committed any act that would render the mind of defendant incapable of cool reflection, and the evidence shows a killing upon express malice. The motion for a rehearing is overruled.

*Overruled.*