### MARION LUSTER v. THE STATE.

No. 1113.   Decided November 8, 1911.

Rehearing denied December 6, 1911.

**1.—Murder—Continuance.**

Where the motion for new trial did not set up in what particulars defendant's attorneys were unable to prepare his case and showed no grounds for continuance, and there was no diligence to procure the attendance of absent witnesses, and their testimony was not of a material character, there was no error in overruling the motion.

**2.—Same—Indictment—Grand Jury.**

Where the indictment definitely alleged that it was the act of the grand jury of the proper court and county, and was sufficient in other respects, there was no error.

**3.—Same—Service of Copy of Indictment—Witnesses.**

Where the names of the witnesses are not placed upon the indictment, and the copy served upon the accused did not contain such names, there was no error, as the statute is only directory.

**4.—Same—Service—Copy of Indictment—Felony—Precept.**

Where, upon trial of murder, the record on appeal showed that the clerk of the trial court made out a literal copy of the indictment at the proper time, and that the sheriff properly served the same on the defendant within proper time before the trial, there was no error, although the sheriff had no precept issued by the clerk commanding him to make such service; there being no injury shown by reason thereof.

**5.—Same—Special Venire—Service.**

Where, upon trial of murder, the defendant was properly served with a certified copy of the list of the special venire more than one day exclusive of the day of service and the day of trial, there was no error in not quashing the special

venire, although the precept was not issued, and there was no seal to the clerk's certified copy of said venire; but the statute was substantially complied with.

**6.—Same—Charge of Court—Manslaughter—Practice on Appeal.**

Where the objection was general in its nature that the court failed to charge on manslaughter, and no special charge requested, there was no error; besides, the evidence did not raise the issue of manslaughter. Following Mansfield v. State, 62 Texas Crim. Rep., 631.

**7.—Same—Sufficiency of the Evidence—Death Penalty.**

Where, upon trial of murder, a conviction assessing the death penalty was supported by the evidence, there was no error.

Appeal from the District Court of Marion. Tried below before the Hon. P. A. Turner.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*J. M. Singleton & J. H. Benefield,* for appellant.—On the question of the court's failure to quash service of indictment and special venire: Evans v. State, 35 S. W. Rep., 169; Lightfoot v. State, 77 S. W. Rep., 793; Hargrove v. State, 51 S. W. Rep., 1124; Barret v. State, 9 Texas Crim. App., 33; Scoville v. State, 77 S. W. Rep., 792; Johnson v. State, 131 S. W. Rep., 1085.

On question of court's failure to quash indictment on account of organization of grand jury at improper term of court: Thomas v. State, 18 Texas Crim. App., 213.

On question of the court's failure to charge on manslaughter: Moffatt v. State, 33 S. W. Rep., 344; Tollett v. State, 55 S. W. Rep., 573.

*C. E. Lane,* Assistant Attorney-General, for the State.—Cited cases in opinions.

PRENDERGAST, JUDGE.—The appellant was indicted by the grand jury of Marion County for the murder of his wife, on April 26, 1910, was convicted, and the death penalty inflicted.

Appellant made a motion for a continuance on two grounds, the first because his attorneys, who were appointed by the court, had not had sufficient time to prepare the defense for the defendant. The other ground was on account of the absence of two witnesses.

The facts show that the defendant was indicted October 31, 1910, and was then in the Marion County jail; that the court that day set November 18th for the trial, and on October 31, appointed attorneys to represent him; that he was afterwards removed from Marion County jail to the Harrison County jail for safe-keeping, and brought back to Marion and replaced in the jail of that county on November 16th. The motion does not set up in what particulars his attorneys were unable to prepare his case for defense and shows no grounds for continuance. As shown by the judge in allowing the bill to the action of the court denying the motion for continuance, one of the witnesses for

whom the application was made, was present and testified on the trial, and, after the application was overruled, defendant made no effort to secure the other witness. "He could have attached her and procured her attendance in plenty of time to have had her evidence on the trial. She was a first cousin of the defendant. She lived about eighteen miles from Jefferson. Trial lasted 18th and 19th; argument closed night of the 19th." So that no diligence was shown to procure the attendance of the other witness. Besides this, one of the witnesses for whose testimony the application was made, testified the reverse of what appellant swore he would·testify, in his application for continuance. Presumably, the other absent witness, if she had been procured, would have done the same thing and her evidence is not shown to have been sufficiently material anyway. There was no reversible error in the court overruling the motion for continuance.

Appellant made a motion to quash the indictment, because the face of it shows that the grand jury was organized at the November term, 1910, when in truth, the grand jury returned the indictment and was organized at the· October term on October 31, 1910. The motion and the record conclusively show that the term of court began and the grand jury was organized on October 31, 1910, and adjourned on November 26th. The indictment fully complies with all the requisites of the statute. Code Crim. Proc., art. 439. The first of it is: "In the name and by the authority of the State of Texas: The grand jurors for the County of Marion, State aforesaid, duly organized as such at the November term, A. D. 1910, of the District Court for said county, upon their oaths in said court, present, etc." As the term of the court began on the last day of October, exclusive of that one day and the balance of nearly four weeks, was held in November, it might properly be designated in a general way as the November term. "The indictment is sufficient if the averments allege definitely that the indictment was the act of the grand jury of the proper county and that it was presented in the District Court of the county when that grand jury was in session." Wright v. State, 35 Texas Crim. Rep., ·367; Hart v. State, 15 Texas Crim. App., 202, 44 S. W., 1105. The lower court correctly refused to quash the indictment on the ground stated.

Appellant made this motion: "Now comes the defendant in the above styled and numbered cause and respectfully moves the court to quash the service of the indictment in said cause, a certified copy of which was purported to have been served this defendant for the following reasons:

"That the said copy served upon this defendant by the sheriff of Marion County, Texas, was, and is not a certified copy of the indictment as is required by the State to be served upon this defendant two days before the trial of the defendant upon the charge of murder, and that the instrument so served upon him is hereto attached, marked Exhibit 'A' and made a part of this motion.

"Wherefore, ·defendant prays the court that said cause be continued until such time as this defendant has been legally served with a certified copy of the indictment the length of time before the trial of said cause as provided by law." The court heard evidence when this motion was presented and the judge, in giving the bill to his action in overruling it, states this: "This term of court opened 31st day of October, 1910. The indictment in this case was presented and filed same day. November 2d, case was set for trial on November 18th, 1910. The clerk prepared a copy of the indictment and delivered it to the sheriff to be delivered to the defendant. W. B. Stallcup was sheriff; Hill Thomas was his deputy. This copy was delivered by the sheriff to Hill Thomas to be delivered to the defendant, which he did, on November 2d, 1910. When the copy was delivered by the clerk to the sheriff, he issued no precept. The sheriff having no precept, made no return showing service. The above facts were testified to by the sheriff and his deputy. The copy served on defendant was a true and correct copy of the original bill of indictment, as presented by the grand jury, but it was not certified by the clerk at all. The original bill of indictment, as returned by the grand jury, had four witnesses indorsed on it. The copy delivered to defendant had these same four witnesses indorsed on it. It was a literal copy. After this, the district attorney discovered two other witnesses and wrote their names on the back of the indictment. These two names, of course, did not appear on the copy served on defendant. After these facts were established, the court held that defendant's right to be served with a certified copy of the indictment two days before trial had been substantially complied with and overruled the motion to which defendant excepted." It further appears from this bill that when this motion was made, the clerk issued another copy of the indictment and certified thereto and issued a precept to the sheriff of the county to serve it on the appellant and the sheriff did so and made his writ on the precept that day, but the court says he did not take into consideration in passing on the matter.

It will be seen by appellant's motion that his motion is to quash the service of the indictment, but to take it as a whole, we understand that he sought to quash this, because the copy served on him was not a certified copy of the indictment. Section 10, article 1, of the Bill of Rights of the Constitution on this subject, is: "In all criminal prosecutions the accused shall . . . have the right to demand the nature and cause of the accusation against him and to have a copy thereof," not that he is to have a certified copy thereof. Article 540, Code Criminal Procedure, requires that in every case of felony, when the accused is in custody, or as soon as he may be arrested, "it shall be the duty of the clerk of the court where an indictment has been presented, immediately to make out a certified copy of the same and deliver such copy to the sheriff, together with a writ directed to such sheriff commanding him forthwith to deliver such certified copy to the defendant." The next article makes it the duty of the sheriff to im-

mediately deliver this copy of the indictment to the defendant and return the writ to the clerk issuing it, with his indorsement thereon showing when and how it was executed. Article 567, id., states that the defendant shall be allowed two entire days, exclusive of all fractions of a day, after his arrest and during the term of court, to file written pleadings; and the next article states that where the defendant is entitled to be served with a copy of the indictment, he shall be allowed two days' time, mentioned in the preceding article, to file written pleadings after such service. Article 432 requires that the State's attorney shall prepare all indictments and shall indorse thereon the names of the witnesses upon whose testimony it was found.

This court, in construing this latter article, has repeatedly held that where such names are not placed upon the indictment, and the copy served upon the accused, has not these names on it, that the statute on this subject was directory, and the failure to place the names thereon and furnish the accused with a copy of them, was not reversible error. Hart v. State, 15 Texas Crim. App., 202; Walker v. State, 19 Texas Crim. App., 176; Leslie v. State, 47 S. W. Rep., 367. In construing the other articles above named, this court, in Barrett v. State, 9 Texas Crim., 33, through Judge Clark, says: "The mere fact that the clerk failed to issue a writ to the sheriff, directing him to serve the defendant with such copy, which is the form prescribed by law for serving copies of indictments (Code Crim. Proc., art. 504), did not affect the substantial validity of the service, especially in view of the fact that, upon the case being called for trial at the same term of the court, no objection was interposed by the defendant to the service as made, and the cause was continued to a succeeding term upon his own application. The omission to issue the writ affected the records of the court, and not the rights of the defendant; and the writ and return are important, chiefly as preserving record evidence that the law has been complied with. The defendant received in person a certified copy of the indictment, and he could have received nothing more had the writ issued.

"But even had the first service been notably defective, we are not sure that the defect was not entirely cured by the subsequent official action of the clerk and sheriff, or that the signature of the clerk at the end of the certificate was essential to the validity of the certificate accompanying the copy of the indictment served upon the defendant a second time. There is no pretence that the copy received by the defendant was not an exact copy of the original, and the clerk testified that the copy and certificate were written by himself in person. The signature of the clerk appears in the body of the certificate, and the attesting seal of the court affirmed and imparted to the instrument all the validity requisite under the law. The constitutional right of the prisoner 'to demand the nature and cause of the accusation against him, and to have a copy thereof,' has certainly not been denied or

abridged, nor is it perceived how any prejudice could have enured to him by reason of the alleged defect, if defect it be." And this court, through Presiding Judge Davidson, in Hargrove v. State, 51 S. W. Rep., 1124, says:

"When the case was called for trial, appellant urged that he had not been properly served with a copy of the indictment. A contest arose over this question, and the bill of exceptions shows that a certified copy of the indictment, together with the writ, commanding the sheriff to serve the same, was directed and given to the sheriff of Mills County; that he carried these papers with him to Ft. Worth, where appellant was confined, and there handed the certified copy of the indictment to the sheriff of Tarrant County, who caused said copy to be delivered to appellant, the sheriff of Mills County making the return upon the writ of the service of said indictment. The certified copy of the indictment was in fact served upon appellant. The contention of appellant seems to be that, in order to make out a legal service, it was necessary that the sheriff of Mills County should execute the writ and make the service in person, and that this must be performed in Mills County. This we understand to be his contention. We do not believe this is correct. The importance of the writ is chiefly to furnish record evidence that the copy has been delivered to defendant; and, if this has been in fact done, no right of his is prejudiced by the neglect or failure of the clerk to issue the writ. Barrett v. State, 9 Texas App., 33; Bonner v. State, 29 Texas App., 223, 15 S. W. Rep., 821. The statute provides that a certified copy of the indictment shall be made out by the clerk, which shall be delivered to the sheriff, together with the writ directed to such sheriff, commanding him forthwith to deliver such certified copy to the defendant. We understand that, under the decisions, if in fact the defendant has had the certified copy delivered to him in time for preparation for the trial, it would not be material that it should be done by the sheriff in person. If in fact the certified copy has been delivered to him, although by some one else than the sheriff, still it would be sufficient under the statute."

We, therefore, take it from the Constitution and these statutory provisions and decisions quoted, that the object and purpose of the law is that if the accused is indicted for a felony and is arrested and in custody, that he shall have a true copy of the indictment so as to enable him to know what the accusation against him is and that he shall have this, at least two days before his trial, so as to give him time and opportunity to prepare for trial and his defense. The record in this case, unquestionably, shows that the clerk made out an actual literal copy of the indictment on November 2, 1910, and that the sheriff on that day actually served it upon the appellant by delivering it to him in person. The certificate of the clerk, that a copy issued by him, is a true copy, would not make it so, unless as a matter of fact, it was a true copy, and if a copy was not a true copy in any essential particular, it would be the duty of the court to quash it and have the

accused properly served with a true copy and postpone the trial of the case until that was done, as was held should be done in the case of Lightfoot v. State, 77 S. W. Rep., 793, but where, as in this case, the clerk issued an absolutely true copy, although he did not certify so and the sheriff actually served that upon the appellant, although the sheriff had no precept issued by the clerk commanding him to do so, it would, in our opinion, fully meet the objects and requirements of the law. And especially is this true when, as in this case, no injury is shown to have occurred to the appellant by reason thereof. If any injury had been shown to have occurred to the appellant by reason thereof, a different question would be raised. So that, we conclude that the lower court did not err in not quashing the service of the indictment upon the appellant.

Appellant made a motion to quash and dismiss the service of the special venire upon him, because what was served upon him purporting to be a copy thereof is not such copy as is required by law to be served upon him. The court heard the evidence, when passing upon this motion, and the bill presenting the question shows that it was proved thereon that the term of court convened October 31, 1910, and the grand jury presented the indictment on that day. On November 2, 1910, the case was set for trial on November 18th, and a special venire of fifty persons ordered drawn in accordance with law and made returnable November 16th; that in accordance with this order, the clerk drew the venire according to law and delivered it to the sheriff on November 2, 1910; the sheriff at once proceeded to summon the jurors in accordance with law. He summoned forty-three, giving the name of each and when and how he summoned him; seven, he failed to summon. He gave the name of each of these, the diligence used and that he did not summon them, because six had removed from the county and one had died. After finishing his work, he returned the whole to the clerk. On November 10, the clerk prepared a true and correct copy of the whole thing, the fifty jurors drawn, the forty-three summoned, and the seven not summoned, and delivered it to the sheriff to be delivered to the defendant. He gave him no process and issued none. On November 16th, the sheriff delivered this certified copy to the defendant in person; he had no precept and made no return showing service. The copy so issued by the clerk and served by the sheriff on the appellant was a literal and exact copy of the original, except that the certificate of the clerk is dated November 10th. It seems that the clerk, on November 17th, examined the original special venire and the sheriff's return thereon in his office, and concluded that the blank certificate thereon ought to be filled out by him, so on November 17th, he filled out the blank, made the proper certificate and signed it, but omitted placing his official seal thereon. The law, article 653, Code Criminal Procedure, requires the clerk to make a list of the names of persons summoned upon a special venire, make a copy thereof and issue a writ commanding the sheriff to deliver such copy to the defend-

ant and requires the sheriff to immediately do so and indorse his return thereon, showing the manner and time of its execution. The next article requires that no defendant, in a capital case, shall be brought to trial until he has had one day's service of the copy of the names of persons summoned under a special venire, unless he waives the right, or is on bail. In our opinion, the record, on this question, clearly shows that this statute was substantially complied with and that the appellant, more than one day, in fact, more than two days, exclusive of the day of service and the day the trial began, was served actually and properly with a copy required by this law, and the court below did not err in not quashing the special venire on the grounds set up in the motion for that purpose.

The appellant nowhere, as shown by the record, asked any special charge, nor does the record show any bill of exceptions to the admission or exclusion of evidence.

In addition to the questions raised by appellant, which we have noted above, the seventh ground of the motion for new trial is: "The court erred in failing to charge the jury on manslaughter as requested by the defendant, because the evidence fully justifies such charge." As stated above, the record shows no requested charge by appellant. Under the circumstances, this ground of the motion is too general to be considered. Mansfield v. State, 62 Texas Crim. Rep., 631, 138 S. W. Rep., 591.

Besides this, we have time and again gone carefully over this record and all the testimony and it is our opinion that no issue of manslaughter was raised or should have been submitted, even if asked by special charge on the trial of the case.

The record shows this state of facts: The appellant was married to the deceased, June 30, 1909, and they lived together until the day before he killed her, which was on April 26, 1910. Prior to her marriage, the deceased had lived at her uncle's, and while living there, two or three years before her marriage to appellant, she had an illegitimate child by Anderson Tyler, who lived on her uncle's place at the time she had the illegitimate child, when she married appellant and when she was killed. The appellant knew about the illegitimate child, who was the father of it, and that Tyler had lived on her uncle's place prior to his marriage and that he was living there during the year and at the time he killed her. Appellant and his wife had lived several miles from her uncle's in the bottom. On the Monday morning before appellant killed her on Tuesday evening late, when he went to work, he left her at his home. He did not come back until night. When he returned at night she was gone; she left home in the morning, sometime after he left home, and went to her uncle's; when appellant returned home Monday night and found she was gone, he at once went to her uncle's, hunting for her. He reached her uncle's between 10 and 11 o'clock Monday night and found she was there and sleeping with a daughter of her uncle. A pallet was made for him in another

room where he slept the remainder of the night. The next morning, after breakfast, as soon as he got an opportunity, he talked to his wife, when she told him that she had abandoned him for the negro, Tyler. He talked to her during that morning as often as he could and tried to shame her and to persuade and induce her to return to his home and live with him, but she persistently refused to do so. He stayed at her uncle's, where she was, all of that day until perhaps the middle of the evening, when they and several others together went fishing. The negro, Tyler, was at her uncle's just about or just after noon on Tuesday, when appellant's wife was there and appellant saw and talked to him at that time. This was after his wife had, that morning, told him that she had left him, appellant, for the said negro, Tyler, and after he had repeatedly talked to her about it, trying to shame her and persuade and induce her to return to his home and live with him. But she persistently refused to return to his home and live with him, but insisted that she had quit him for the negro, Tyler.

On the way to the creek, going fishing, the State's witnesses claim, that the appellant was along with the crowd, but more particularly with the deceased, and that he was playing and fooling with her in a good humor and in that way making love to her, attempting to induce her to return home. He denied all this, but said that he was trying, during the day, to induce her to return to him and that while she would talk to him occasionally friendly, she was more unfriendly than friendly during the whole time.

After they got down to the creek and began fishing, one of his witnesses states that appellant left them saying that he was going home and told his wife good-bye. Another witness testified that late in the evening the appellant came to where she was in the field plowing, not very far from where the crowd was fishing, stating to her that he was after a drink of water. She, hearing the laughing and talking down on the creek by the others, and among them his wife, asked appellant if his wife was going back to him and he replied, no, that he couldn't get her to come back, but if she didn't get her to come back somebody was going to be hurt. Appellant, after this conversation with this witness, returned to where his wife was fishing. One of the State's witnesses said that she heard appellant and his wife, immediately before he killed her, and saw the killing and heard what passed between them at the time. She testified that she was fishing near them in the same creek and was close enough both to see and to hear. The appellant stated that this witness was some thirty to fifty yards from him and his wife at the time, but that because of bushes and weed, she could not see them. This State's witness, in effect, testified that immediately before the killing, she heard the appellant ask the deceased repeatdly if she was going to go home with him and she as often replied no, and appellant then struck her in the breast with his fist. The witness testified that the lick was with his fist (the evidence would justify the finding that it was not with his fist, but that he stabbed her at this

time with his knife); that the effect of this lick was to cause the deceased to turn around and around and as she was doing so, she exclaimed two or three times, "O-o-oh, I'll take you back." That the appellant said, "If you don't do me no good, you won't do no other God damn negro no good.". That she then fell or was knocked by the appellant into the water. He then jumped astraddle of her in the water and began stabbing her with his knife. The evidence clearly shows that he stabbed her two or three times in the breast, one of the breast stabs opening her breast several inches; that he stabbed her one or more times in the stomach, ten times in the back and that he cut her throat from ear to ear, cutting the whole of the wind pipe and the neck to the bone, almost severing the head from the body. This State's witness who was nearest to him at the time of the killing, as soon as appellant knocked deceased into the water, called to one of the other women who was with the crowd fishing further up the creek and away from them, and that that woman at once came down to where she was and they both started down to where the deceased and appellant were in the water. The one furthest off, who had not seen what had occurred, thinking that the deceased had fallen into the water and was drowned; that when they got near to where appellant was coming out of the water, he cursed them and ordered them away and began to hunt for something to hurt them with and that they thereupon became scared and ran away and gave the alarm. The appellant ran away and, although the sheriff and his deputies began hunting for him that night, they did not catch him until on the sixth day thereafter, and he was then in some other county other than the one in which the killing occurred.

The appellant claimed, in his testimony, that at her uncle's house, when he talked over the matter to her in the morning of the day he killed her in the evening, "Why, she told me she was quit me for Anderson Tyler. Of course, I tried to shame her out of it and tried to get her to come on back home; that is what she told me before we left the house. . . . I would talk to her as often as I could get her to talk to me when she wasn't where anybody else was. . . . As to what I said to my wife on the branch at the time of the trouble, I told her she ought not to talk about telling me to my face she would quit me for another man and she said, 'Yes, I did say so, and if you fool around with me, I will have you killed.' I told her not to tell me that any more." And he claims that she thereupon, having a knife in her hand and he having his in his pocket, got up and grabbed him by the collar and began raking on him with the knife she had. That he had on a slicker and that she did not cut him and she made no impression on the slicker and did not anywhere cut him or the slicker, and, he claims, that what he did then was all through passion; that he had no intention to kill her; that he loved her and didn't want to kill her. He admits that in the morning, when he first talked to his wife, she told him that she had quit him for Anderson Tyler; that

at noon or about that time, Anderson Tyler was at her uncle's house where he and his wife and the others were and that he himself talked to Anderson Tyler at that time, but said nothing to him about his wife having quit appellant for him, Tyler. He claims also that at the immediate time of the killing, he was angry and scared, angry about what his wife had told him that she had quit him for Tyler and would not return home with him, and was scared because she was raking on him with her knife and that he started in on her with his knife because he was afraid and through the heat of passion.

Under all the circumstances and the testimony in this case, it is our opinion that the evidence did not call for a charge on manslaughter; that the killing of appellant's wife by him was premeditated, after studying over it and thinking about it and talking with her all day, and after failing to induce her to return to him and not quitting him for Anderson Tyler; that he determined to kill her and did then and there kill her, as testified to by one of the witnesses so that if she did not do him any good, she would not "do no other God damn negro no good."

There being no reversible error, the judgment will be affirmed.

*Affirmed.*

[Rehearing denied December 6, 1911.—Reporter.]