### JOE STEEL v. THE STATE.

#### No. 4751.   Decided January 16, 1918.

**1.—Murder—Continuance—Second Application.**

Where, upon trial of murder, defendant filed his second application for continuance, which failed to allege that the testimony of the absent witnesses could not be produced from any other source, and also showed a lack of diligence, and moreover the alleged testimony was only cumulative, there was no error in overruling the motion.   Following Bosley v. State, 69 Texas Crim. Rep., 100, and other cases.

**2.—Same—Substituting Indictment—Practice in District Court.**

Where the record on appeal showed an order of the court substituting the indictment in the case, and conformed to article 482, C. C. P., there was no error.

**3.—Same—Evidence—Harmless Error—Bill of Exceptions.**

Where the bill of exceptions did not show that the cross-examination of defendant's witness by the State, although improper, was in any way harmful to the defendant, there is no reversible error.   Following Huggins v. State, 60 Texas Crim. Rep., 214, and other cases.

**4.—Same—Arrest of Witness during Trial.**

Where the circumstances did not bring it within the rule which requires the case to be reversed, where the court by having a witness arrested or taken in custody indicates his view of his testimony, there is no reversible error.

**5.—Same—Jury and Jury Law—Return of Verdict.**

Where appellant complained that the jury did not give sufficient consideration to his case, in that it brought in a verdict in about twenty minutes, but the bill of exceptions did not verify this, there is no reversible error, even assuming the fact that it did.

**6.—Same—Self-defense—Charge of Court—Actual Danger—Apparent Danger.**

Where the court's charge on self-defense is criticised that it submitted the issue of actual danger alone, but the record showed that the court also submitted a special charge submitting the law of apparent danger, there is no reversible error.

**7.—Same—Manslaughter—Charge of Court.**

Where, upon trial of murder, the evidence did not raise the issue of manslaughter, and the objections to the court's charge were of general character, there is no reversible error.   Following Ford v. State, 40 Texas Crim. Rep., 280, and other cases.

Appeal from the District Court of Bowie. Tried below before the Hon. H. F. O'Neal.

Appeal from a conviction of murder; penalty, ninety-nine years imprisonment in the penitentiary.

The opinion states the case.

*Joe Hughes,* for appellant.—On question of improper conduct of district attorney: Shed v. State, 68 Texas Crim. Rep., 373, 153 S. W. Rep., 125; March v. State, 44 Texas, 64.

On question of the court's failure to charge on manslaughter: Rutherford v. State, 15 Texas Crim. App., 236; Williams v. State, 15 id., 617; Meuly v. State, 26 id., 274; Bonner v. State, 29 id., 223; Childers v. State, 33 Texas Crim. Rep., 509; Gilcrease v. State, 33 id., 619; Williams v. State, 61 id., 356.

*E. B. Hendricks,* Assistant Attorney General, for the State.

MORROW, JUDGE.—Appellant's conviction was for the murder of Burton Wiggins, his punishment being assessed at confinement in the State penitentiary for a term of ninety-nine years.

The killing of deceased by appellant was not controverted, but he sought to justify on the ground of self-defense. The homicide took place at the residence of E. Wiggins, the father of the deceased. The son, Burton Wiggins, and his wife also resided there. All of the parties were negroes. Appellant and some others who were witnesses went to the home of E. Wiggins for the purpose of gambling. The deceased was not one of the party, but was at work at some place in the city and returned to his home about dinner time. Appellant had been cursing in the house and in the hearing of the wife of deceased, who was in another room. Deceased, learning of the cursing, remonstrated with appellant, and was shot and killed by him. The version of E. Wiggins, father of deceased, and some of the other State's witnesses, is that the deceased came into the room in which appellant and others were, and said: "Men, don't be cursing in there, my wife is in the kitchen," to which appellant replied, "God damn you and your wife, too, you black son-of-a-bitch," deceased replying, "You don't mean to call me a son-o-a-bitch because I asked you not to curse before my wife." Appellant said, "Yes, I do," drew an automatic pistol from his pocket, and fired one shot, striking deceased in the breast near the nipple, inflicting a wound from which he died in a very few moments. This witness, E. Wiggins, claimed that the parties were about five feet apart, the deceased standing with his back to the dresser with both hands in his pocket; that he did not take them out until after he was shot. He said that about the time the shot was fired appellant said, "Get away from that dresser." He also claimed that he, witness, ran and appellant chased him with his pistol. He claimed that the de-

ceased did not speak in an angry manner; did not make any move to get anything, and did not make any move until he fell down. "From the way he acted he did not know that Joe Steel was going to shoot him, nobody wouldn't have knowed it at the time,—they wouldn't have thought it." The wife of deceased gave substantially the same testimony as her father-in-law. The State's witness Holmes testified that in a conversation between appellant and others before deceased came appellant remarked that he bet he would kill somebody before the year was out. We quote from his testimony as follows: "Burton (deceased) came in,—well, Joe was still cursing, and Burton came in there and said to Joe, 'You've got to cut that cursing out and respect my wife and daddy,' and Joe Steel called him a son-of-a-bitch, and when deceased started in the room his father said, 'You go on back, I will attend to everything myself,' and he wouldn't go back, and he came back with both hands in his pocket, just leaning up against the dresser, and he said to Joe, 'You don't mean to curse me for a son-of-a-bitch because I asked you not to curse before my wife,' and Joe shot him, and he turned clean around and fell on his face. Deceased had come to dinner and had walked in there; at the time he was shot he had both hands in his pocket. He walked up to the dresser and backed to the dresser, with both hands in his pocket, and said, 'You don't mean to call me a son-of-a-bitch,' and Joe shot him." Whether there was a pistol on the premises or in a bureau drawer was a disputed issue, E. Wiggins and deceased's wife testifying that there was none. There was testimony that E. Wiggins made some effort to prevent his son, deceased, from going in the room, and that he, E. Wiggins, had made some contradictory statements. Some of the eyewitnesses for the defendant claimed that the father of the deceased remonstrated with appellant for cursing, and that appllant said he would not do so again. That when deceased came in he walked up to the dresser and pulled one hand out of his pocket and backed up to the dresser; that he did not know whether he was trying to get in the drawer or not. He claimed that when deceased came in he said: "Let me in there, I will stop that cursing—I will kill him; let me get to that drawer, I will stop him—I will kill him." Appellant told him twice to get away from the drawer and stay out of it. Another witness for the defendant gave substantially the same testimony as to deceased coming in the room and saying he would kill him, and said that deceased commenced pulling on the drawer and was in the act of putting his hand in the drawer when appellant shot. This witness, Smith, said that after the shooting the father of deceased took a pistol off of deceased. We quote from him as follows: "He goes out of the front door and Joe Steel behind him, and comes around from the back and takes a sixshooter off of this boy, out of the drawer, and comes on the front porch." The presence of this witness at the time of the homicide was controverted.

Appellant testified that when he was cursing in the house deceased's

father told him to stop on account of his son's wife being in the house, and that he, appellant, apologized. E. Wiggins, deceased's father, was called Big Smokey or Smokey, and deceased was called Little Smokey. We quote from appellant as follows: "Big Smokey said, 'Joe has started cursing, and I am going to break up the game,' and this boy heads in the middle door, and Smokey said, 'You go back, I will run the house,' and he said, 'No, I ain't going to have nobody cursing over my wife,' and he and his daddy tussled in the door a half a minute, and during the tussle someone knocked on the front door, and it was two women, and when he leaves this door he goes to the dresser drawer, and he said, 'If I get to this dresser drawer I will stop him, I will kill him,' and after he goes to the door, and there stands Smokey there and Little Smokey over here at the dresser drawer, and here stood Babe Holmes. I knew Babe Holmes and Smokey were good friends, and Babe didn't like me, and that is why I shot. I didn't know whether I hit him—I didn't care whether I hit him, I just wanted to keep him out of the dresser drawer; he made an attempt three times to get in the dresser drawer, and stood there a minute or three minutes after I shot. I could have shot him six times, but I didn't make any attempt to shoot him any more; that is how the trouble was. He said, 'If I get to that dresser drawer I will stop the son-of-a-bitch or kill him,' and when he got to the dresser drawer he said, 'Joe Steel, you don't mean to run over me and my family,' and I said, 'I am not running over your family, I did curse, and I told your daddy I wouldn't do it any more,' and someone said, 'You know you wouldn't let anybody curse over your family like this,' and I said, 'No, because I ain't going to have no such a bunch as this around my family.' When he walked up to this dresser he started to open the drawer, and I looked him so straight in the eye until he kinder checked up, and he asked me did I mean to run over him and his family. He was trying to get in the drawer, and he had it just about that far open; and I knew this Burton negro—I knew he would hurt a fellow, and that is why I wouldn't take any chances. As to whether I thought there was a gun in that drawer; I knew there was one. I mighty near knew there was one in there. I shot because I thought he was going to get a gun to shoot me; that is what he said he was going to get; he said he was going to kill me, and that is all he could get out of there was a gun. I did not try to shoot Big Smokey after that. There were three men in the house that I was afraid would try to hurt me."

Appellant sought a second continuance on account of the absence of his wife, Lillie Steel, and Charley Lowe, in which he claimed that his wife would testify that appellant went to the house where the homicide took place about 10 o'clock in the morning and remained there until after the homicide. That the testimony would become material because E. Wiggins had testified on the examining trial that appellant after going to the house about 10 o'clock and after stating that he was

going to kill a man at that house before night, had left and returned
about twenty minutes before the homicide. The court, in qualifying
the bill, says this witness did not see the difficulty or any part of it,
and her testimony was immaterial in that it was to contradict the wit-
ness that it was thought the State might use. From our examination
of the statement of the facts we do not find that the State proved by
the witness E. Wiggins that the appellant had made the remark men-
tioned in the application, or that he had left his house between his
first arrival there and the homicide. It appears, however, that the
appellant introduced part of the testimony of this witness given at the
examining trial, to the effect that appellant came back to the house
about noon. That on the introduction of this part of the evidence
the State introduced the balance wherein the witness claimed that ap-
pellant had said he was going to kill a man in the house before night.
The application as to both the witnesses named fails to charge that the
testimony can not be procured from any other source. Aside from that
defect, the testimony of the appellant's wife would become material only
in the event the State had proved by the witness Wiggins that the
appellant had made more than one visit to the house before the homi-
cide. The testimony of the other witness named in the application was
to the effect that deceased was in the act of pulling out the dresser
drawer to get a pistol when the shot was fired. The application, as
above stated, did not declare that this evidence could not be had from
any other source, and in fact it was in substance cumulative of other
testimony given on behalf of defendant by some of his witnesses. There
is also a finding of the trial judge in his qualification to the bill that
there was a lack of diligence to procure the attendance of the witness.
Article 609, Code of Criminal Procedure, provides that this application
should state the testimony could not be procured from any other source.
Vernon's Crim. Stats., vol. 2, p. 324; Fulkerson v. State, 57 Texas
Crim. Rep., 80. At the same page of Vernon's will be found a number
of cases to the effect that it is not error to overrule an application for
continuance to secure cumulative testimony. See Bosley v. State, 69
Texas Crim. Rep., 100, 153 S. W. Rep., 878; Johnson v. State, 55
Texas Crim. Rep., 134, and other cases listed.

There was an order of the court substituting the indictment in the
case. Article 482, Code of Criminal Procedure, authorizes the substi-
tution of the indictment and provides the procedure therefor. We are
unable to discern any departure from this procedure or failure to
observe its provisions, pointed out in the bill of exceptions or existing
in the record. See Vernon's C. C. P., p. 249, and cases listed.

In the cross-examination of Adam Brown, one of defendant's wit-
nesses, who among other things had testified, giving testimony indicat-
ing that another witness favorable to appellant named Smith was pres-
ent and saw the homicide, the prosecuting attorney asked the witness
Brown if Smith had not left the scene of the homicide a few minutes

before it occurred, to which the witness gave a negative answer. The prosecuting attorney then said: "I want to give you a fair show; we can prove where he, Mex (Smith) was. I want you to swear positively whether or not Mex was there." Objection was made that this manner of cross-examination was in the nature of browbeating or bluffing a witness, to which the prosecuting attorney answered that he was not bluffing but meant to have Brown indicted if he swore that Smith was present. The court told the jury not to pay any attention to the remarks of the attorney  The witness did swear that Smith was present as shown by the bill, and did not in response to the remarks of the district attorney change or modify his statement so far as the bill shows. The proceeding was not such as ought to have occurred. 40 Cyc., 2517. As disclosed in the bill, however, it does not appear to have been harmful, and consequently not reversible. Huggins v. State, 60 Texas Crim. Rep., 314; Siars v. State, 63 Texas Crim. Rep., 567, and cases cited in Vernon's C. C. P., p. 710.

Complaint is made of the fact that the witness Will Smith was arrested during the trial. An inquiry as to the facts was developed and is made part of the bill from which it appears that a complaint was made against Will Smith charging him with perjury. That it was not made in court or under the direction of the judge, nor in the presence of the jury, and so far as shown by the bill the jury was not aware of the fact. The circumstances do not bring it within the rule which requires the case to be reversed where the court, by having the witness arrested or put in custody, indicates his view of his testimony.

In his motion for a new trial the appellant complains that the jury did not give sufficient consideration to his case in that it brought in a verdict in about twenty minutes. The facts relating to the matter are not verified by any bill of exceptions. Assuming them to be correct, however, our attention has been directed to no precedent which would authorize us to reverse the case upon that ground alone.

The court's charge on self-defense is criticised on the ground that it submitted the issue of actual danger alone. This criticism is correct so far as the main charge is concerned, but was cured in a special charge given at the request of appellant, which fairly submitted the law of apparent danger.

The issues in the case were murder and self-defense. Manslaughter, we think, was not involved. Ford v. State, 40 Texas Crim. Rep., 280; Dougherty v. State, 59 Texas Crim. Rep., 464, 128 S. W. Rep., 398; Luster v. State, 63 Texas Crim. Rep., 541, 141 S. W. Rep., 209; Johnson v. State, 74 Texas Crim. Rep., 179, 167 S. W. Rep., 733; Lamb v. State, 74 Texas Crim. Rep., 301, 168 S. W. Rep., 534; Lamb v. State, 75 Texas Crim. Rep., 75, 169 S. W. Rep., 1158; Jackson v. State, 30 Texas Crim. App., 664, 18 S. W. Rep., 643; Blount v. State, 58 Texas Crim. Rep., 509, 126 S. W. Rep., 570; Hardeman v. State, 61 Texas Crim. Rep., 111, 133 S. W. Rep., 1056. The failure to charge on

manslaughter is mentioned in the brief, but not in any bill of exceptions. The reference to it in the objections to the court's charge is of a character held too general. Branch's Ann. P. C., p. 1131, sec. 2004.

We have carefully reviewed the record and finding the evidence supporting the State's theory, if believed to be true, sufficient to support the verdict, and no reversible error being committed in the trial, the judgment of the lower court is affirmed.

*Affirmed.*