## H. L. W. GILCREASE v. THE STATE.

*No. 917. Decided November 28.*

1. **Murder—Threats—Continuance—New Trial.**—On a trial for murder, where defendant had made a second application for continuance to prove communicated threats made by deceased to kill him, and the two theories presented by the facts proved established either on the one hand an unprovoked murder, or on the other self-defense, *Held,* a new trial should have been granted to enable defendant to prove the facts stated in his application for continuance, notwithstanding the proposed testimony was somewhat cumulative.

2. **Same—Charge—Provoking Difficulty—Self-Defense.**—On a trial for murder, where it appeared that the difficulty occurred on account of defendant's closing up a gate in a fence where he had a right to do so, *Held*, it was error for the court, by its charge, to limit defendant's right of self-defense to his provoking the difficulty and producing the occasion for the killing; and calling the attention of the jury specially to his nailing up the fence as the act or means by which the difficulty may have been provoked.

3. **Same—Self-Defense.**—A citizen can not be deprived of his right to protect his life for doing, in a lawful manner, that which he had a legal right to do.

4. **Manslaughter—Charge.**—Where a defendant is shown to have killed deceased through terror, and under the belief that his life was in danger, the killing would be manslaughter, even though his belief was not reasonable. And so if defendant was engaged in a lawful business, and he is approached by armed parties in a threatening manner and ordered to desist, and this creates in his mind anger and rage, under the influence of which he shoots and kills one of the parties, though it is not reasonable to believe that his life was in fact in danger, the offense would nevertheless be manslaughter; and the charge should, in effect, so instruct the jury.

5. **Same—Evidence—Motive, Acts, and Conduct of Deceased.**—On a trial for murder, evidence as to the reasons and motives of deceased in going armed to the place where defendant was is inadmissible, unless they were known to defendant.

6. **Same—Threats by Defendant—Hearsay Evidence.**—It is error to admit the testimony of a witness to the effect that another party had told him of threats made by defendant against himself and deceased, and that this induced them to go armed to the place where the killing occurred, such evidence being illegal and hearsay. Following Cochran v. The State, 28 Texas Crim. App., 422; Bell v. The State, 20 Texas Crim. App., 445.

APPEAL from the Criminal District Court of Dallas. Tried below before Hon. CHARLES F. CLINT.

Appellant was charged by indictment with the murder of one W. W. Holman, in Dallas County, on the 29th day of July, 1891, by shooting him with a gun. At his trial he was convicted of murder of the second degree, with punishment assessed at six years' imprisonment in the penitentiary.

The statement of facts is very voluminous, comprising the testimony of some twenty-eight witnesses. The defensive theory, as well as the facts and circumstances attendant upon the killing, are best shown and illustrated by the testimony of defendant as a witness in his own behalf, and are as follows:

H. L. W. Gilcrease, the defendant, testified in his own behalf, as follows, to wit: That in 1891 he lived on a farm owned by himself, about one and a half miles from Riley, in Dallas County, and also had the Wanderlick farm, about one mile from Riley, leased, and which farm he had in cultivation in cotton and corn in 1891, going from his home place with his wife and farm hands to work the crop when necessary. The defendant knew the deceased and Pleas Holman and Mrs. A. Holman, and by his permission Mrs. Holman, Henry Holman, and Effie Holman, her children, were permitted to stay in the house on

said place, the defendant reserving the use of a crib upon the place and the use of the entire premises, except two houses occupied by Mrs. Holman and her children.  Mrs. Holman paid no rent, and only agreed to keep the stock out of the field for the use of the two small houses used by her, and the smokehouse.  Under the agreement she had no use or control of the premises other than the houses occupied by her, and only so long as the defendant should permit or consent thereto.  Mrs. Holman moved into the house several months preceding the killing, at which time the entrance and exit to the premises was a wagon gate near the well, about 400 yards from the house, near where the pasture fence joined the field fence, the pasture being outside the farm.  Said gateway was left for use as long as she remained on the place, and opened out upon the public road.  Another wagon gateway was in front of the house, about seventy yards from the house, and led into the pasture.  Sometime after the occupancy of the house by Mrs. Holman, the defendant for his own convenience put in a wagon gateway in the pasture fence, opening upon the public road, and in front of the house, and about ten or fifteen steps from said field gate connecting the field and pasture.  The stock had been depredating upon defendant's crop in said field, for which reason he had put a lock and chain upon the outside pasture gate, and kept it locked in order to keep stock from getting into the pasture and into the field through or over the field fence, he having found the gate open upon several occasions, and stock in the field.  Two or three of the locks and chains previously put upon the gate had been broken and thrown away by some person unknown to defendant.  Prior to the day of the homicide defendant had not been to the Wanderlick place for a week or ten days, at which time he left said gateway leading from the pasture to the road locked.  The fences were good, and the danger from stock was in leaving the gates open.  Defendant had requested Mrs. Holman to vacate the houses occupied by her, previous to the date of the killing, but she refused, and continued in possession thereof over objection of defendant.  Her sons, Pleas Holman and W. W. Holman, did not live with her on the place.  Pleas occasionally visited her.  The first time defendant ever saw W. W. Holman on the place was the date of the killing.  On Wednesday, July 29, 1891, the defendant, with his wife and Andy Clark, an orphan boy being raised by them, and two hired hands, Charles Young and William Coots, went from defendant's home to work in the crop on said Wanderlick farm, and reached the place about 8 o'clock in the morning, and found the pasture gate open, and lock and chain thereon gone.  "I took the gate down and wired up the gateway space, so as to keep stock out; left the wagon, dinner, etc., at the crib used by me for that purpose, and went with my wife, Andy Clark, and the hands to the field to work.  I had several times complained to Mrs. Holman about the stock being in the field, and she

told me to lock the gate, and I commenced to lock the gate in May, 1891, and carried the key with me. It was after this that I requested Mrs. Holman to vacate the premises, and she was occupying them, over my objection, at the time of the homicide. When I reached the place that morning I only saw Mrs. Holman and some small children; did not see Pleas Holman or W. W. Holman. We went to work in the field 300 or 400 yards from the house. Shortly before noon I heard two guns fire near the house of Mrs. Holman. At noon I quit work, and sent Andy Clark with a sack to the cornfield to get corn with which to feed the horses. The balance went to the crib reserved and used by me for dinner, storage, and other purposes. I built a fire and my wife commenced to make coffee, when my attention was called to the pasture or outer gate. The wires had been knocked down, the gate put back, and was open so that stock could get in. I told Charles Young and William Coots to come with me and help fix the gate. About this time Jack Love, a cousin of the Holmans, came up and went along with Coots. We reached the gate, and I commenced work fixing it. I heard some one say, 'Look out; yonder comes the Holman boys.' I looked up, and saw Pleas Holman and W. W. Holman nearly half-way between the house and the first gate, coming towards me with their guns. Pleas Holman cursed me and hallooed something about the gate. Jack Love, William Coots, and Charles Young started off in a run. I asked them not to leave me, and called to my wife, who was at the crib, to bring me my gun; and started towards the crib, going to the gate in the field fence. I believed from the manner and appearance of the Holmans that it was their purpose to attack me and kill me with their guns. I called to my wife to bring me my gun for the purpose of protection, and went to the gate to meet her, and to hold the tree, on which the gate was hung, between me and the Holmans, and which was only ten or fifteen steps from the gate upon which I was at work. The Holmans reached this field gate as soon as I did, coming thirty-five or forty yards, while I travelled the ten or fifteen steps between the two gates. When I was near the inner gate I said to the Holman boys, 'Boys, don't shoot me. I do not want any trouble with you.' Pleas Holman replied, 'G—d d—n you, we are going to kill you,' and had his gun up to his face in a shooting position. W. W. Holman was behind him with a double-barrel shotgun, holding it in a shooting attitude. They were on the inside of the field inclosure; I was in the pasture. The fence separating the field and pasture was made of rails, and I was holding the big tree, upon which the gate was hung, between me and them, and pulled the gate around towards me as additional protection. The gate was made of plank, six inches wide and one inch thick; the planks were very close together, and they could not get a good shot at me. When Pleas Holman said they were going to kill me, I drew an old pistol which was

in my pants pocket, and hugged the tree. Pleas Holman continued advancing and rushed through the gate into the pasture, and shot me in the right arm and body. He was so close to me that the flash from his gun set my coat afire, and I was enveloped in smoke. My wife ran up to the fence and handed me my gun, which I took with my left hand. Pleas Holman ran off. I heard Charley Young say, 'Look out, you will get shot again.' I told him as he came up to me that I was badly shot, and he replied, 'Look out, or you will be shot again.' I saw W. W. Holman behind a tree fifteen or twenty steps distant, with his gun in a shooting position, and trying to get a shot at me. I moved my position. He sprang from behind the tree, and I fired. It was from two to four seconds after I got my gun until I shot. There was not more than thirty or forty seconds between the shot fired by Pleas Holman and the one fired by me. W. W. Holman did not say for me not to shoot. W. W. Holman was trying to shoot me, and when he sprang from behind the tree I believed it was to get a better shot at me. He was armed with a double-barrel shotgun. I fired only one shot—only one barrel of my gun would shoot; the tube was off of the right-hand barrel. I shot with my left hand; my right arm was paralyzed and hung uselessly by my side. When I got my gun I could have shot Pleas Holman, but he ran, and then there was no further danger from him, and I was trying to avoid being shot by W. W. Holman. It was my habit to carry a gun to and from the farm; had done so all the year. When I drew the pistol I threw down a monkey-wrench which I had in my right hand, and took the pistol from my right-hand pants pocket. I did not put my hand through the gate or try to shoot Pleas Holman through the gate; nor did I ever present the pistol at him. I did not extend my arm with the pistol in hand towards Pleas Holman. My arm was half bent, with the hand near the chest, when I was shot. The pistol was 32 calibre. It belonged to Mrs. Cox, and I had fixed it for her and had it for the purpose of returning it to her, if I saw her or had an opportunity in going to or from the farm on that day. She is in attendance upon this trial. The pistol was no account, but I thought I might protect myself with it. I believed that Pleas Holman was trying to kill me, and that W. W. Holman was trying to do the same thing, and I shot him to keep him from shooting me."

Cross-examined: "W. W. Holman had his gun in a shooting position when he sprang from behind the tree. If he had left the tree and gone towards the house his side would have been towards me. I did not see the Holman boys until they were coming towards me where I was at work on the gate. I did not know that they were on the place until that time. They were both armed. Pleas Holman said, 'Hold up there, God damn you,' before I called to my wife to bring me my gun; I saw the two men coming towards me; heard them cursing; they were armed, and seemed to be mad and coming to attack me, and I called for

my gun to protect myself.  Mrs. Holman had no right to the gate I was closing up.  This gate was in the pasture.  It opened upon the road, and was put in by me for my own convenience after she moved upon the place.  The whole place was under my control and used by me, except the houses occupied by her.  Mrs. Holman had no right upon the place after she became troublesome, and I had notified her to vacate the premises.  She was occupying the houses without my consent at the time of the homicide.  I had requested her to vacate some weeks before the killing, which she declined to do.  On that morning I closed up that gate so as to keep stock out; no purpose in so doing to annoy Mrs. Holman.  I had tried to keep the gate locked, and locks and chains were broken off, and I closed the gate to protect my crop from stock.  On that morning when I went to the field to work I left my gun in the crib.  The gate was at the well; opened into the public road.  I had never had a quarrel with Pleas Holman or W. W. Holman, and had no unkind feelings towards them.  I had no ill-will towards Mrs. Holman.  I did not ask Mrs. Holman for permission to close up the pasture gate.  She had no authority in the matter.  She had consented to my locking the gate in May, 1891, when I first began locking it.  When Pleas Holman and W. W. Holman were coming towards me, and before I left the pasture gate, they hallooed to me to let the gate alone, and said, 'Hold up, God damn you.'  I do not know where the deceased was struck.  When I reached Mrs. Hall's, after the shooting, I have no recollection of stating that if my ammunition had not given out I would have killed more of the Holmans.  Only one barrel of the gun could shoot, and the balance of the ammunition was at the crib, and I could not have made that remark."

This testimony of the defendant is fully corroborated by his witnesses.

On the other hand, the State's witnesses testified, that deceased was unarmed and behind a tree at the time his brother Pleas Holman shot defendant, and that when defendant's wife handed him the gun deceased jumped from behind the tree and started to run, and was running when defendant shot him in the back with a load of buckshot, killing him almost instantly.

Defendant's second application for a continuance was overruled by the court.  By this application, it was alleged that defendant could prove the following facts by the absent witnesses:

By the witness Elijah Pike the defendant expected to show, that on the Sunday preceding the homicide the deceased met said witness and informed him that he had heard of some trouble between the defendant and Mrs. Holman, mother of the deceased; that he was going to her house and returning home for the purpose of killing defendant; and he was prepared and intended so to do.  And the application

alleged that defendant expected to show a communication of said threats by the witness to the defendant prior to the homicide.

By the witness Alf Woody, that on the Sunday preceding the homicide the deceased told witness that he was advised by his mother that the defendant was making trouble for her, and that he (deceased) was coming home for the purpose of killing defendant, and intended remaining in Dallas County until he did kill him.

By the witness Veon the defendant expected to prove, that immediately after the homicide said witness went to the house of the deceased and saw a double-barrel shotgun hid between mattresses on the bed in said house; that said gun was not brought to said house by Love and Little after the homicide, as claimed by them; and that said gun so hid between the mattresses corresponded with the description of the gun had by deceased at the time of the killing, as described and stated by the eye-witnesses.

It was contended by the State that the defendant was the aggressor, and the deceased unarmed at the time of the killing. The evidence was conflicting upon these issues, and the testimony alleged in the application for continuance, it was claimed, was material in the determination thereof.

That portion of the testimony relating to the threats of the defendant, and which occasioned the motives, acts, and conduct of the deceased and brother, Pleas Holman, in going armed to the place of the killing, and which was admitted over defendant's objection, is thus stated in his bill of exceptions:

It having been proven that the homicide occurred on the Wanderlick place, in Dallas County, and that the defendant immediately preceding said homicide was putting wires upon and closing up the pasture gate on said premises, which was under his control; and it further having been proven that Mrs. A. Holman, mother of the deceased, was a tenant at will or by sufferance on said premises, being such tenant of the defendant. And that while defendant was so engaged in closing up said pasture gate, that the witness Pleas Holman, armed with a gun, and W. W. Holman, unarmed, as contended by the State, and armed with a double-barrel shotgun, as contended by the defendant, came hurriedly from a house upon said premises used by their said mother, and advanced towards the defendant, commanding him to desist from closing up the gate. The State offered to prove, and did prove, by its witness Pleas Holman, that he and his brother, W. W. Holman, were advised of the defendant's closing up the gate by a message sent from his mother by a niece of said Pleas Holman; which testimony was admitted without objection. And then the State, over the objection of the defendant, introduced the following testimony by said witness Pleas Holman, to wit: That upon receiving said message, that he, the said Pleas Holman, picked up his gun and started out of

Vol. XXXIII. Crim.—40

the house and went, together with his brother, W. W. Holman, towards the defendant, said witness being permitted to state, over objections of the defendant: "I took my gun because I had heard from my mother of the threats made by the defendant to her on the day before. My mother told me on the day before the killing, that the defendant (Gilcrease) on said date had told her that the next time he came down to the place he would come prepared to kill the whole G—d d—n bunch. My mother told me this the day before, and that is why I carried the gun with me when I went out of the house towards the defendant." Which testimony was objected to by the defendant at the time it was given, upon the following grounds, to wit: That it was hearsay, irrelevant, and incompetent; that the same was in explanation of the motive and intent of Pleas Holman, a party to said difficulty resulting in the homicide, which motive and intent was unknown to the defendant; and that said testimony did not tend to throw light upon the motive and intent which prompted the defendant in the commission of the homicide, and was a trial of the defendant from the standpoint of Pleas Holman. But the court overruled said objections and admitted said testimony, upon the grounds that it was competent for the witness to explain the motive and intent which prompted him to arm himself and go to the defendant, and as tending to show the making of threats by defendant, and the communication thereof to the witness Pleas Holman. To which decision and ruling of the court the defendant then and there excepted.

There was no proof by Mrs. A. Holman of any threats made by the defendant. The record discloses no threats made by the defendant.

Numerous exceptions were taken to the charge of the court, which are not discussed in the opinion of the court below. With reference to self-defense, provoking the difficulty, and manslaughter, the opinion sufficiently discloses the errors in said charge.

*Kearby & Muse,* for appellant.—1. The court erred in overruling defendant's application for continuance, and in refusing the motion for new trial on account thereof, in that the testimony of the absent witness was material, true, and would probably have effected a more favorable verdict in behalf of the defendant. The testimony of the absent witness Pike in relation to the communication to the defendant of the threats of the deceased was not supplied from any other source, and the testimony of said witness in regard to the facts alleged could not be proven from any other source. Willson's Crim. Stats., secs. 2169, 2186, and authorities cited.

The absent testimony in relation to threats was material, as tending to show the deceased to have been the aggressor in the difficulty resulting in the homicide, and as tending to show malice and a conspir-

acy between the deceased and Pleas Holman to provoke the difficulty and kill the defendant.

The testimony of the absent witness A. Veon, in relation to the gun hidden between the mattresses, was corroborative of the testimony of the defendant's wife, Charley Young, and Andy Clarke in relation to the deceased's being armed when killed, and tended strongly to establish the truth of that fact.

2. The testimony of Pleas Holman as to threats of defendant communicated to him by his mother, and the reasons and motives which prompted him to arm himself and seek defendant, was hearsay and incompetent, and is a trial of defendant from the standpoint of the witness. Willson's Crim. Stats., sec. 2494; Segura v. The State, 16 Texas Crim. App., 231; Cochran v. The State, 28 Texas Crim. App., 422; Bell v. The State, 20 Texas Crim. App., 445.

The court erroneously charged the jury upon the law of manslaughter, in that said issue, together with self-defense, was predicated upon the theory that the defendant produced the occasion of the homicide by an original wrongful act, and restrained and limited said issues upon the finding of the intention of the defendant, without reference to any overt act; and erroneously submitted the issues of provoking the difficulty by the defendant, and imperfect self-defense, without evidence therefor; and limited sudden passion to the acts of the deceased, without reference to the acts of Pleas Holman; and failed to submit the issue of manslaughter upon the theory raised by the evidence, of a deadly assault by Pleas Holman, and the killing of deceased in sudden passion under circumstances not sufficient to justify, induced by his co-operation, or apparent co-operation, in said assault; and said charges were wholly without specification as to the character of such wrongful act of the defendant referred to, or of any wrongful act, and failed to make any affirmative application of the law thereto; and were upon the weight of the testimony.

The law of imperfect self-defense was not applicable to the case, nor legitimately raised by the evidence.

The charge does not submit to the jury any issue of fact or transaction for their determination as to whether the defendant was in the wrong therein, nor what act or any act was calculated to produce the occasion or provoke the difficulty; and under said charge any act which was calculated to produce or provoke the difficulty, no matter how legal or rightful, destroyed the right of self-defense.

The charges thereon erroneously circumscribed said issue and virtually eliminated it from the case; charged upon aggression by the defendant, not warranted by the evidence; submitted the issue of such wrongful aggression by the defendant, with less than felonious intent; and by the erroneous charge in reference to the legal presumption against the defendant from the use of a deadly weapon, and to which

exception was reserved, as shown by exception number 1, construed with the erroneous charges upon the law of manslaughter, said issue was eliminated from the case.

The court erroneously failed to submit the issue of manslaughter upon the theory raised by the evidence: that if Pleas Holman was the aggressor and shot defendant, and from the acts and conduct of W. W. Holman defendant believed his life in danger, and, actuated by sudden passion, shot with the intent and purpose to protect his life or his person, and the circumstances were not sufficient to justify such belief on the part of the defendant, then his right of self-defense was imperfect, and his offense no greater than manslaughter.

The court erroneously charged upon provoking the difficulty and producing the necessity for the homicide by the defendant, and upon the issue of imperfect self-defense, in that the same was unwarranted by the evidence.

The record shows a deadly assault by the Holmans, occasioned by the defendant's wiring up a gate in the exercise of his legal right so to do, without knowledge of the presence of the Holmans; the wounding of the defendant by Pleas Holman, the killing of the deceased, while aiding or apparently aiding in such deadly assault. Said issues in the charge were not legitimately raised by the evidence. Willson's Crim. Stats., 981, 1030; Meuly v. The State, 26 Texas Crim. App., 274, 302, 305–308; Howard v. The State, 23 Texas Crim. App., 265, 278–280; Hobbs v. The State, 16 Texas Crim. App., 517, 522, 523; Ball v. The State, 29 Texas Crim. App., 107, 125, 126.

3. The court therein erroneously instructed the jury, in effect, without warrant of evidence therefor, that if defendant sought the deceased with the intention, unheralded by any act, of bringing on a difficulty without intention to kill or do serious injury, and the deceased, seeing it, made a violent assault, and the defendant resisted and killed deceased to save his own life, the offense would be manslaughter; and murder if the intention in seeking was to kill, although the intention was unheralded by any act. And under the charge, intention without reference to acts was made the test of crime; and self-defense forfeited upon intention alone. Ball v. The State, 29 Texas Crim. App., 107, 125, 126.

4. The court erroneously, in said charge and elsewhere, failed to submit the issue of manslaughter upon the phase of the case presented by the evidence of the deadly assault by Pleas Holman and wounding of the defendant, the killing of the deceased under sudden passion engendered by such assault while aiding or apparently aiding therein, under circumstances insufficient to justify the belief of danger from him. And erroneously failed to apply the law relating to the acting or apparent acting together of the deceased and Pleas Holman in such deadly assault. Howard v. The State, 23 Texas Crim. App., 265, 305–

308; Cartwright v. The State, 16 Texas Crim. App., 473, 487, 488; Mc-Laughlin v. The State, 10 Texas Crim. App., 340, 359, 360; Jones v. The State, 20 Texas Crim. App., 665, 670–672.

5. And the Court therein and elsewhere failed to instruct the jury that the Holmans were not justified in attacking the defendant by reason of the wiring up of the gateway, irrespective of whether that act was lawful or unlawful. And the court failed to instruct the jury that if the wiring up of the gate was unlawful, that the Holmans were justified in using only so much force as was necessary to procure a desistance therefrom; and if in so doing they or either of them made or were apparently about to unlawfully make an assault upon the defendant with deadly weapon or weapons, and the homicide resulted under such facts, as to the issue of manslaughter and self-defense arising therefrom. The court erroneously failed to present this phase of the case to the jury.

6. The charge of the court embraced in the third and fourth exceptions erroneously confined sudden passion to the provocation given by the deceased, in that Pleas Holman was the aggressor, if such aggression was without intent to kill, in that the same was unwarranted by the evidence, and a restriction upon the law of self-defense. And erroneously instructed, in the consideration of the sufficiency of the provocation, etc., to weigh the past conduct of the deceased and those connected with him in the matter toward the defendant, his threats and bearings, without specification as to what matter was referred to, and without evidence of threat by the defendant.

[The other portions of the able brief of counsel are devoted to isues not discussed in the opinion, and are therefore omitted.—REPORTER.]

*R. L. Henry*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—The defendant was charged by indictment with the murder of W. W. Holman. Trial by jury resulted in conviction for murder in the second degree, with the penalty assessed at six years in the penitentiary. Judgment and sentence accordingly, from which defendant prosecutes this appeal.

An application to continue for the want of testimony of the witnesses to prove threats made by the deceased to kill defendant, which were communicated to him; also, to prove that deceased, as well as his brother, had guns at the place and time of the shooting. The theory of the State was that appellant, unprovoked, killed the deceased; that of the defendant was self-defense. Both theories were supported by testimony; hence a conflict in the testimony as to who was the aggressor— who began the violence. Threats, whether communicated or not, in such a conflict, are of very great importance, as they tend to solve the

problem at issue. The State's witnesses deny that the deceased was armed with a gun at the time he was shot. If this be true, appellant was in no actual danger when he shot deceased, nor was the danger apparent, when all the circumstances are considered, and self-defense was not in the case. The application should have been granted, although it was the second application; and, after the trial, the court, viewing the facts of the case as developed on the trial, should have granted a new trial to have enabled the appellant to obtain the testimony, though it was somewhat cumulative.

By a careful inspection of the record, it is evident that Mrs. Holman was simply a tenant at will; that she had no right to, or control of, the fences surrounding the farm. When, by permission of appellant, she went into the cabin, there was no gate at the place where a gate was subsequently placed, and appellant had the right to place a gate there, and close it, without infringing upon any of the rights of Mrs. Holman. Notwithstanding this, the court in its charge repeatedly instructed the jury in regard to appellant's provoking the difficulty, or producing the occasion, which led to the killing of deceased; limiting his right of self-defense by these charges, and in one part thereof calling the attention of the jury specially to his nailing up the fence as the act or means by which the difficulty may have been provoked. To all of these charges appellant excepted at the time, reserving his bills of exception. There is not the slightest circumstance in this record demanding a charge upon the doctrine of provoking the difficulty or producing the occasion which led to the homicide. Startling and alarming, indeed, is the proposition that the citizen will be deprived of the right to protect his life for doing, in a lawful manner, that which he had a legal right to do.

The charge upon manslaughter is upon a state of facts not presented by the record, and it fails to apply the law of manslaughter to the facts presented by the record. Appellant did not contend for manslaughter because of insulting words or gestures, or a battery so slight as to show no intention to inflict pain, or an injury to property unaccompanied by violence. His contention was: first, self-defense; second, if not self-defense, that he was shot by the brother of deceased, the deceased being present, armed; and that he believed that his life was in danger from him, and was in terror. If the belief was not reasonable, then the killing under such circumstances would have been manslaughter. Another view upon this subject: Appellant was engaged in a lawful business—nailing up his fence. Two men armed with guns approached in a threatening manner, ordering him to desist from doing that which he had a right to do. Now, if a degree of anger and rage was created in his mind by these facts and attending circumstances, and he shot deceased when it was not reasonable to believe that his life was in danger, then the killing would have been manslaughter.

Bill of exceptions in regard to the admission of certain evidence. The reasons which prompted Pleas Holman to go armed to appellant, while at the gate, are not admissible unless they were known to the appellant. They were not known. Mrs. Holman does not swear that appellant ever threatened the deceased or his brother. In fact, under the facts in this case, it is preposterous to assume that he had made such threats, for he did not know that deceased and his brother were in the country, and had no reason for believing that they would be at their mother's at any particular time. That this evidence is not admissible, see the following authorities: Cochran v. The State, 28 Texas Crim. App., 422; Bell v. The State, 20 Texas Crim. App., 445.

For the reasons stated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.