## WADE MANSELL v. THE STATE.

### No. 3935.    Decided February 9, 1916.

**1.—Murder—Evidence—Opinion of Witness.**

Where, upon trial of murder and a conviction of manslaughter, the defendant desired to introduce in evidence the expression of his wife, to the effect that it was nothing more than she expected, after hearing of the difficulty, there was no error in ruling out this testimony, as it did not throw any light on the transaction.

**2.—Same—Evidence—Cross-examination.**

Where, upon trial of murder and a conviction of manslaughter, the defendant in cross-examination of the wife of the deceased showed by her testimony that she ran a hotel after her husband's death, for the purpose of leaving the impression upon the jury that her character was not above reproach, there was no error in permitting the State to show that the deceased had left the witness no property and that after his death she ran this hotel to make a living.

**3.—Same—Evidence—Declarations and Acts by Defendant.**

Upon trial of murder, there was no error in permitting the officer who arrested defendant to testify that at defendant's instance he searched him and found no knife or weapon of any character on him; this being contemporaneous with the arrest.

**4.—Same—Evidence—Rebuttal—City Ordinance—Hack Drivers.**

Where the homicide grew out of ill-feeling caused by the arrest of the deceased at the instance of defendant, both being hack drivers carrying passengers from the depot, and defendant introduced in evidence facts to show that deceased in crossing the line at the depot to secure baggage had violated the city ordinance and that this was the reason for defendant's action in reporting the matter to the officer, there was no error in permitting the State to show that deceased had in fact not violated this ordinance.

**5.—Same—Evidence—Dying Declarations.**

Where defendant introduced witnesses who testified that deceased refused to make a statement or dying declaration, there was no error in permitting the State to show that the deceased did not refuse, but said at the time he felt too weak to make a statement to the county attorney, and afterwards did make the statement that he tried to get away, a proper predicate having been first laid; to counteract the impression that deceased recognized he was in the wrong and for this reason refused to make a statement about the difficulty.

**6.—Same—Evidence—Character and Condition of Deceased.**

Where defendant contended that he killed deceased in self-defense and introduced testimony as to the ability of the deceased to inflict death or serious bodily injury, there was no error in permitting the State to show that the defendant knew the condition of deceased before and at the time of the difficulty, and that the deceased suffered from rheumatism since he was a child, and this permanently impaired his strength and the use of his limbs.

**7.—Same—Evidence—Clothing of Deceased.**

Unless it can be shown that the clothing of deceased is virtually in the same condition at the time of its introduction in evidence as it was at the time of the difficulty, it should not be introduced in evidence; however, as the court sustained an objection thereto, there was no reversible error.

**8.—Same—Evidence—Acts of Defendant.**

The fact that the defendant, four or five days after the homicide, when the body of deceased was being shipped for burial, was at the depot talking and laughing to his relatives a few feet from the corpse, while apparently heartless in the presence of the relatives of the deceased, should not have been admitted in evidence.

**9.—Same—Continuance—Materiality of Testimony—Diligence.**

Where, upon trial of murder and a conviction of manslaughter, defendant filed an application for a continuance which on its face showed sufficient diligence to procure the absent witness and that his testimony was material on a contested issue in the case, it was reversible error to overrule the same and not to grant a motion for new trial; although defendant and his son testified to the same facts.

**10.—Same—Adequate Cause—Charge of Court—Aggravated Assault.**

Where, upon trial of murder and a conviction of manslaughter, the defendant requested a charge to find him guilty of aggravated assault even if he had a specific intent to kill, the same was correctly refused.

Appeal from the District Court of Palo Pinto. Tried below before the Hon. W. J. Oxford.

Appeal from a conviction of manslaughter; penalty, three years imprisonment in the penitentiary

The opinion states the case.

*J. T. Ranspot, W. P. Smith,* and *W. H. Penix,* for appellant.—On question of continuance: Chapman v. State, 179 S. W. Rep., 570.

On question of refusing charge on aggravated assault: House v. State, 171 S. W. Rep., 206; Reeves v. State, 74 Texas Crim. Rep., 503, 168 S. W. Rep., 860.

*C. C. McDonald,* Assistant Attorney General, for the State.—On ques-

tion of opinion of witness: Dever v. State, 37 Texas Crim. Rep., 396; Williford v. State, 36 id., 414; Barbee v. State, 50 id., 426; Marsh v. State, 54 id., 144.

On question of cross-examination: Dubose v. State, 10 Texas Crim. App., 230; Skidmore v. State, 57 Texas Crim. Rep., 497; Singleton v. State, 57 id., 560; Sealey v. State, 43 id., 66.

HARPER, Judge.—Appellant was convicted of manslaughter, and his punishment assessed at three years confinement in the State penitentiary.

The evidence would show appellant owned a hack line plying between the depot and the hotels in Mineral Wells, and drove one of the hacks; that Davidson Brothers also owned a hack line, engaged in the same character of business, and that deceased, C. A. Jackson, was driving one of their hacks. It appears that in Mineral Wells they have an ordinance which will not permit the drivers to cross a certain line at the depot to solicit business. Appellant at one time in the past had crossed this line and been compelled to pay a fine for so doing. On Thursday or Friday before the homicide deceased had crossed this line, as appellant thought, to solicit business, and thereby secured a passenger. Appellant reported this to an officer, but deceased was not arrested, as Mr. Davidson testified deceased did not cross the line to solicit the passenger, but the passenger had motioned to deceased to come and get his baggage, and deceased only crossed it to get the baggage. The evidence would further show that there was some rivalry and perhaps ill-will existing between the local hack lines, which existed not only between the owners but also extended to the drivers of the hacks. There is no evidence that appellant made any threat, except that he would again report deceased if he crossed the line soliciting business. The defendant's testimony would have deceased make several threats,—one that when appellant reported him to the officer he said, "I will get even with that man if I have to kill him." Mr. Huddleston testified that on Friday before the difficulty he was present when Davidson and appellant were discussing a stand at the depot, when appellant said: "Come here, Arthur, I will show you I am right, where I am," when deceased remarked, "I am going to stop there next time if I get killed over it." The State's witnesses say when their attention was attracted to the parties that deceased was backing while appellant was advancing; that both parties were fighting, but they saw no knife in the hands of deceased, while some say they saw a knife in the hands of appellant; that after backing across the sidewalk deceased fled across the street, defendant following him to the edge of the sidewalk, when defendant turned and started to his hack; that after deceased got across the street he picked up a plank about 1x3, three feet long and came back across the street, when the parties again started to fighting. Deceased struck appellant across the head with the plank, and appellant struck deceased with a knife; the knife had a blade variously estimated from three to four inches in length. Deceased fell,

and when examined he was found to have a number of wounds in his body. One witness says: "There were three wounds in Mr. Jackson's left side that penetrated the left lung and there was a stab to the hollow on the right side and a stab through the arm and the nerve of the left arm was cut in two. The three wounds on the left side penetrated the pleural cavity and collapsed the left lung. We couldn't tell the depth of the wounds in the lung on account of the collapsed condition of the lung. What I mean by the lung's being collapsed, the air was out and it went down just like a football or anything with the air out. Mr. Jackson had a stab wound under the left arm, which wound penetrated the pleural cavity—the three wounds penetrated the cavity, while it seems that the wound under the arm was the most serious." One of these wounds slightly penetrated the covering of the heart. While deceased lived several days, it is made apparent these wounds caused his death.

Appellant and his son testify that on Sunday, while waiting at the hotel with their hacks, deceased drove up and said, "I want to know why in the hell you tried to have me arrested at the depot the other day," when appellant replied, "I did it because it is a violation of the law." Other remarks ensued, when deceased called him a d—d son of a b—h, and struck appellant and continued to rain blows on him, throwing him back, when appellant's son ran against deceased and knocked him back. Appellant contends that deceased had a knife, and when deceased was knocked by his son he, appellant, drew his knife, and they again began fighting, deceased backing at this time. Deceased then fled across the street, getting a plank and returned and renewed the difficulty, striking appellant on the head and arm, when appellant continued to strike him with his knife. The doctor who dressed appellant's wounds says: "I found on his left side of his head an abrasion—that is, a stroke or a blow on the side of his head about 2¾ inches wide and about 3¾ inches long. The blow had been struck and was all raised up, swelled up, and spotted with blood underneath the skin, and there was a little cut upon the forehead and a cut about 1½ inches long under the left eye and a cut on the inside of the left thumb, taking part of the nail, and the outside of the left thumb and a cut on the left hand, inside—a snag, deep snag, as if a nail had snagged it. . . . That was on the day this cutting of Mr. Jackson occurred. I measured the wound on Mr. Mansell's head and it was 2¾ inches wide and 3¾ inches long, beginning about half an inch back of where the eyelashes extend and came back over the ear, very puffed and swelled and the blood spots under the skin. As to how heavy the lick or stroke was, I remarked at the time it was enough to fracture an ordinary man's skull—I should judge it was a heavy stroke. The wound on the front of the head was small but bleeding freely—had him covered with blood—I should judge it was half an inch long. The wound under the left eye cut through the skin and into the muscles—it was comparatively a shallow cut, but it was a raking cut. That wound was a little too large to have been done with the finger nail. His thumb

nail was slit and a cut in the left thumb and ball of the thumb was a jag like it had been jagged with a nail, and in the left thumb was a lineal cut which I wouldn't judge was over a quarter of an inch long, and it nicked the nail possibly half an inch. And the nail on the right hand was cut about the same. He had an abrasion on the arm, as if a slanting blow had come down on his arm—an abrasion for several inches—the skin was peeled off on the outside of the arm for several inches, as if a sliding blow had struck him." This sufficiently states the case to discuss the various questions raised.

Appellant desired to prove that, when appellant's wife was made aware of the difficulty, she said, "It was nothing more than I was expecting." This was an expression of the wife after the difficulty and could not and would not have any influence on appellant, and would tend to throw no light on the difficulty, and the court did not err in holding this expression of the wife inadmissible under the circumstances.

There are several bills objecting to the court permitting the deceased's wife to testify that her husband left her no property, and after his death she ran a hotel in Mineral Wells to make a living. Before this testimony was admitted, appellant in cross-examination of Mrs. Jackson had proved by her that she ran this hotel after her husband's death, and by his examination sought to leave the impression on the jury that her character was not above reproach. Under such circumstances there was no error in the court permitting the State on redirect examination to show that she ran the hotel in order to earn a livelihood and that it was necessary that she do so.

There was no error in permitting the officer who arrested appellant to state that, at appellant's instance, he searched him and found no knife or weapon of any character on him. This was contemporaneous with his arrest.

As appellant introduced evidence to show that deceased in crossing the line at the depot to secure baggage had violated the law, and this was the reason for his reporting the matter to the officer, there was no error in permitting it to be shown he in fact had violated no ordinance.

Appellant had three witnesses testify that deceased refused to make a statement or dying declaration. After this testimony had been adduced by appellant there was no error in the court permitting the county attorney to testify that deceased did not refuse, but said he at that time felt too weak, and asked the county attorney to come back later; nor in permitting Mrs. Drew to testify to a dying statement in which deceased stated: "Sister, I tried to get away." It is made clear that deceased had no hope of recovery at the time this statement was made; that he was sane, and the statement was a voluntary one. Appellant, by attempting to prove that deceased had refused to make a statement, was endeavoring to create the impression on the jury that deceased recognized he was in the wrong, and for this reason was refusing to make a statement about the difficulty.

Again, the physical condition of deceased was made an issue in the case. Appellant introduced witnesses who testified that deceased would

weigh 175 to 180 pounds; that he was an expert boxer; that he was a well muscled and solid, and a strong man. Under such circumstances there was no error in permitting the State to show that he suffered from rheumatism, and had suffered from it since he was a child eleven years old; that it had affected his back, and he walked in a stooping position, carrying one of his hands on his back. Appellant was contending that he killed in self-defense, and the ability of deceased, under 'the circumstances, to inflict death or serious bodily injury was an issue in the case. It is true the appearances must be viewed as they appeared to defendant at the time, but it is shown that he knew deceased's condition before and at the time of the difficulty. The court in approving the bill says: "Approved with the qualification that the State's testimony showed that deceased was a cripple afflicted with rheumatism that permanently impaired his strength and use of his arms, legs and body. The defendant introduced testimony showing the deceased to be a strong and active man and a skilled boxer a few days before the homicide, and the court then permitted the State in rebuttal to show by the sister of deceased that the deceased's affliction had existed from the time he was eleven years old and had continued up to his death."

As the court excluded the clothing when proper objection was made by defendant and before it was introduced in evidence, there is no need to discuss the bill complaining of this matter. However, unless it can be shown that the clothing is now virtually in the same condition it was at the time of the difficulty, on another trial it will not be displayed in front of the jury.

By one bill it is shown that some four or five days after the difficulty, and when the body of deceased was being shipped from Mineral Wells, appellant was at the depot talking and laughing to his relatives, standing in a few feet of the corpse. This may, and perhaps did, appear heartless to deceased's relatives, yet it could not and would not be of any aid to the jury in determining the legitimate issues in the case; it may have had a tendency to prejudice the jury against appellant, and testimony as to his conduct on this occasion should not have been admitted.

We think the bill complaining of the refusal of the court to grant a continuance on account of the absence of the witness H. T. Eustace presents an error that will necessitate a reversal of the case. Attached to the motion for a new trial is an affidavit of this witness, made in Alabama, showing that he would testify that deceased began the difficulty by making the first remark, and that deceased struck the first blow, and, further, that the witness would testify that deceased was armed with a knife during the difficulty. This was a seriously contested issue on the trial, the State contending that deceased had no knife, and had made no effort to cut appellant. That, if he had anything in his hands, it was a metal comb which he carried in his pocket. Appellant and his son both testified that deceased was armed with a knife, and, if Eustace would swear that deceased was thus armed, it would have a strong tendency to cause the jury to believe that, if it

was in fact a metal comb in deceased's hands, it really appeared to appellant at the time to be a knife, and it is as the matter appeared to the defendant at the time that his acts must be judged. The testimony of this witness would support the testimony of appellant, and his son directly and pertinently on the issue of self-defense, and we can not say that it would not result in a different verdict. Of course, the testimony of the State would support a verdict of guilty, but in passing on whether or not a continuance should be granted, we look to see if he had been deprived of testimony material to his defense and if he has used diligence to secure the testimony. The showing of diligence we think sufficient, and, when on motion for a new trial appellant shows the witness would in fact testify as he contends, and the testimony is of a material character, that it is cumulative of his own testimony and that of his son, but appellant had no other witness not related to him who would so testify, we are inclined to the opinion a new trial should be granted.

The court did not err in refusing to give the charge wherein appellant requested the court to instruct the jury that "even though defendant committed an assault with a specific intent to kill, but at the time of the commission thereof the defendant's mind from an adequate cause, and the defendant was laboring under such a degree of anger, rage, resentment or terror, such as rendered his mind incapable of cool reflection, you will find the defendant guilty of an aggravated assault." Under such circumstances the appellant would be guilty of manslaughter and not aggravated assault.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*