## JOE HENDERSON v. THE STATE.

### No. 7701.   Decided November 15, 1922.

**1.—Murder—Continuance—Subsequent Application—Defendant as a Witness.**

A subsequent application for a continuance may be denied where the testimony of the absent witness is supplied from other sources, particularly if it is uncontroverted, but where the only other source from which the testimony may be obtained is defendant's own testimony this rule does not obtain, and in the instant case where the diligence was sufficient and the testimony material, the application should have been granted.   Following Beard v. State, 55 Texas Crim Rep., 157, and other cases; besides, the testimony was not uncontroverted.

**2.—Same—Charge of Court—Manslaughter—Insulting Words to Female Relative.**

Whether insulting language was adequate cause is not a proper question for the jury to determine, and where such testimony is in the case the same is adequate cause in law, and it is not proper to limit the charge on manslaughter by telling the jury that the passion must be sudden and must arise from some act or occurrence at the time, where the cause is from insulting language to female relative.   Following Stewart v. State, 52 Texas Crim. Rep., 283; besides, the charge on manslaughter should have been differently drafted, and this is said in view of another trial.

Appeal from the District Court of Van Zandt.   Tried below before the Honorable Joel R. Bond.

Appeal from a conviction of murder; penalty, 45 years imprisonment in the penitentiary.

The opinion states the case.

*Young & Stinchcomb, Johnson, Edwards & Hughes, Wynne & Wynne, C. L. Hubbard, N. M. Crawford, Lacy & Bramlette,* for appellant.   On question of manslaughter:   Leslie v. State, 57 S. W. Rep., 659.

On question of charge on manslaughter: Shamon v. State, 28 S. W. Rep., 687; Airheart v. State, 51 id., 214; Duke v. State, 133 id., 432; Claud v. State, 153 id., 892; Fox v. State, 158 id., 1141; Quinn v. State, 170 id., 783.

*R. G. Storey,* Assistant Attorney General, for the State.

MORROW, PRESIDING JUDGE.—Conviction is for murder; punishment fixed at confinement in the penitentiary for a period of forty-five years.

The facts, in the main, are the same as set forth in the opinion on the former appeal.   (See 89 Texas Crim., 229, 21, S. W. Rep., 537.)

On this trial, appellant testified to the alleged facts concerning the controversy with the deceased over the ownership and possession

of some turkeys. These turkeys, according to his testimony, were raised on his premises, but had strayed over to the home of his son, Charley Henderson, where they remained for some six weeks or more. They were missed, and he, with the consent of the wife of the deceased, made an inspection of some turkeys on the premises of the deceased but was unable to identify any of them as belonging to him. Later he brought his daughter-in-law, Mrs. Charley Henderson, to the premises of the deceased that she might inspect the turkeys, and on that occasion, his son, Raymond Henderson accompanied him. While inspecting the turkeys, Mrs. Henderson identified some of them as belonging to the appellant, and a controversy between her and the deceased ensued in which the deceased used towards her insulting words and conduct. This, the same day, she communicated to her husband, Charley Henderson. The homicide took place on the first meeting of deceased and Charley Henderson subsequent to this information. The above was appellant's version of the affair, and on the former trial was supported by the testimony of Mrs. Charley Henderson and Raymond Henderson. At the time of the homicide, it was appellant's claim and testimony that the deceased drew a pistol and was in the act of shooting Charley Henderson. A pistol was found upon the scene and it was the State's theory that it belonged to the appellant. This appellant denied, and Mrs. Charley Henderson would have corroborated his testimony upon this phase of the case.

It was appellant's testimony that some days after the transaction, relating to the turkeys had transpired, he, and his son, Charley Henderson, while on the way to the county seat, overtook the deceased, and Charley Henderson got out and accosted the deceased about insulting his wife; that the deceased assumed a hostile attitude, and put his hand in his pocket, apparently in the act of drawing a pistol; that the appellant at the time was sitting in his car, which had passed the wagon of the deceased, and as he got out of his car, the deceased got out of his wagon; that he saw the deceased on the side of the wagon opposite that which Charley Henderson was on at the time, and the deceased had a pistol in his hand and was in the act of trying to fire it at Charley Henderson when the appellant grabbed it out of his hand and the deceased fell.

In addition to justifiable homicide, the appellant relied upon the mitigating facts to bring the offense within the law of manslaughter. The court recognized that the evidence raised this issue and submitted the following charge to the jury:

"The law provides that the provocation causing the sudden passion must arise at the time of the killing; however it is your duty in determining the adequacy of the provocation, if any, to consider in connection therewith all the facts and circumstances in evidence in the case, and if you find by reason thereof that the defendant's mind

at the time of the killing was incapable of cool reflection and that said facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirement of the law, and so, in this case, you are instructed that if you believe from the evidence that Charley Henderson had been informed that the deceased, Robert Killingsworth, had used insulting language and conduct toward Monnie Henderson, wife of Charley Henderson, *and you furth'r find that at the time or just prior to the shooting, the deceased, by some act or words or by acts coupled with words caused Charley Henderson's mind* or the mind of the defendant, Joe Henderson, to become inflamed or aroused with passion or resentment, or anger, then in determining the state of mind of the said Charley Henderson, as well as the state of mind of the defendant, Joe Henderson, you may consider the evidence with reference to the dispute or difficulty respecting the turkeys, and what occurred at that time, what was said and done by deceased, and what, if anything, the said Charley Henderson had been told occurred, and what deceased had said to the said Monnie Henderson, or his conduct towards her, as may be shown by the evidence; and considering all the evidence in this ca e, the circumstances occurring before, as well as those occuring at the time of the shooting, you will determine the state of the mind of the defendant and the state of the mind of the said Charley Henderson, and if you believe that such facts and circumstances in evidence created in the defendant, Joe Henderson, or in the said Charley Henderson, such a state of mind as to render the defendant, Joe Henderson, or the said Charley Henderson, incapable of cool reflection, and that such state of mind did actually exist at the time of the commission of the offense, then the same would be deemed in law adequate cause, reducing a voluntary homicide to the grade of manslaughter.''

Special charges were also given upon the issue of manslaughter at the request of the appellant. The defensive theory of manslaughter was inseparably connected with the transaction about the turkeys and particularly with refernce to that part of it in which the deceased had used insulting words or conduct toward the wife of Charley Henderson and the communication of that fact to the said Charley Henderson, prior to the homicide. All of these facts were raised in the present trial of the case by appellant's testimony.

In a subsequent application for a continuance, appellant sought delay, in order to obtain the testimony of Mrs. Charley Henderson, Raymond Henderson and Mrs. Joe Henderson, his wife. Without entering into details, it is enough to say that this application was not deficient in any statutory requisite. The witnesses had testified upon the former trial, were under process; and it is shown that their absence was not due to any fault or connivance of the appellant; that

from unavoidable cause they were unable to attend, and that
there was probability of securing their attendance by a reasonable
delay.   Proper complaint was made of the action of the court in
overruling the application for a continuance and in refusing to grant
a new trial after verdict and brought forward for review.   The State
contends that since the appellant testified to the facts which he ex-
pected the absent witnesses to reveal, there was no harmful error in
refusing the continuance.   In other words, the State advances the
proposition that the evidence upon which the defensive theory of man-
slaughter was supported was uncontroverted and that the trial court
was warranted in denying the continuance and overruling the motion
for new trial although the testimony of the absent witnesses was
material.   The case relied upon by the State· as supporting this
theory is one in which the facts, which were held uncontroverted,
were proved by witnesses other than the accused.   Washington v.
State, 103 S. W. Rep., 879.   It is well settled, in fact, it is a statutory
requirement that a subsequent application for a continuance may be
denied where the testimony of the absent witness is supplied from
other sources, particularly if it is uncontroverted.   Code of Crim.
Proc., Art. 609; Cortez v. State, 82 Texas Crim. Rep., 143; Mitchell
v. State, 87 Texas Crim. ·Rep., 530; Steel v. State, 82 Texas Crim.
Rep., 483.   This rule, however, does not obtain where the ''only other
source from which the testimony may be obtained'' is appellant's own
testimony.   The interest of one accused of crime tends to discredit his
testimony given in his own behalf and where he testifies to important
facts, presenting a defense or mitigating the offense of which he is
charged, that fact alone will not justify the court in overruling the
motion for new trial where it appears that other persons would have
given evidence corroborating the appellant and where due diligence
has been used to secure the attendance of the absent witnesses and the
probability of securing their testimony by postponement or con-
tinuance is made plain.   The cases illustrating the application of this
rule are numerous.   See Beard v. State, 55 Texas Crim. Rep., 157;
Asken v. State, 47 Texas Crim. Rep., 365; Koller v. State, 36 Texas
Crim. Rep., 499; Casey v. State, 51 Texas Crim. Rep., 433; Phipps
v. State, 34 Texas Crim. Rep., 560; Morgan v. State, 54 Texas Crim.
Rep., 549; Gilcrease v. State, 33 Texas Crim. Rep., 619; Givens v.
State, 21 S. W. Rep., 44; Mansell v. State, 79 Texas Crim. Rep., 48,
182 S. W. Rep., 1138; Taylor v. State, 73 Texas Crim. Rep., 192, 164
S. W. Rep., 844.

In the instant case, however, we think it is not accurate to say that
the appellant's testimony was not controverted.   His cross-exami-
nation by the State's counsel covers many pages in the statement of
facts, and by *innuendo* the interrogations by State's counsel tended to
discredit appellant's testimony with reference to the conduct of the

deceased towards Mrs. Charley Henderson and to suggest that he, his son and Mrs. Charley Henderson were aggressive and harsh in the conduct of the interview and the deceased tempered and inoffensive.

On the issue of self-defense, the negro Sargent, whose testimony is adverted to in the opinion on the former appeal (229 S. W. Rep., 541) is in direct contravention of appellant's defensive theory growing out of the use of a pistol by the deceased. Appellant explained on the trial the presence of the pistol which was found upon the ground and claimed it was used by the deceased. The testimony of Mrs. Joe Henderson would have corroborated appellant and combatted the State's position that the pistol was placed there by the appellant.

The charge, which we have quoted, submitting the issue of manslaughter is justly criticized because it does not give effect to the statutes declaring that "insulting words or conduct of the person killed toward the female relation of the party guilty of the homicide" as adequate cause. Penal Code, Article 1132. Charley Henderson had been informed and believed that the insulting conduct took place. The statute made it adequate cause. Whether insulting language was adequate cause was not a proper question for the jury to determine. The question was the effect of the information touching insulting conduct upon the mind of Charley Henderson; whether the homicide was upon the first meeting subsequent to the knowledge of the insulting conduct and whether such conduct was the real cause of the killing. Penal Code, Articles 1133, 1134, 1135. Under such state of facts, Charley Henderson's offense might have been reduced to the grade of manslaughter, although there was no "sudden passion," arising from some "act done or word spoken at the time of the homicide." On that phase of the case, the theory was that the information received several days before the homicide engendered the passion at that time and that it continued and operated upon his mind, when on the first meeting of the deceased he killed him. When insulting conduct to a female relative is the adequate cause relied upon, it is not proper to limit the charge on manslaughter by telling the jury that the passion *must be sudden and must arise from some act or occurrence at the time.* On this subject, we refer to Stewart v. State, 52 Texas Crim. Rep., 283 and cases therein cited; also Squyres v. State, 92 Texas Crim. Rep., 160, 242 S. W. Rep., 1030.

There were three viewpoints upon which the jury should have been instructed in regard to the law of manslaughter, i. e., if Charley Henderson's mind was rendered incapable of cool reflection by the insulting conduct and on the first meeting he killed the deceased in consequence of the passion thereby engendered, the verdict against the appellant should be no more than manslaughter. This phase should have been submitted in a segregated manner, enabling the jury to thoroughly comprehend it and differentiate it from the other phases

of the cause. If the jury did not believe that by the testimony touching the insulting conduct towards the female relative, the mind of Charley Henderson was rendered incapable of cool reflection, they were still authorized to reduce the offense to manslaughter if they believed that from such information and from other matters arising at the time of the homicide that sudden passion was produced in the mind of Charley Henderson or that of the appellant such as to render the mind of either of them incapable of cool reflection, and that under such influence Charley Henderson killed the deceased, the verdict should not be more than manslaughter. It is possible that in view of the several special charges given at appellant's request, the faults pointed out in the charge in question were cured or at least, rendered not harmful. In view of another trial, however, we have said this much concerning the charge that was given. We believe, however, that the court should have granted a postponement or continuance, and on failure to do so, should have set aside the verdict, for the reason that the absent testimony was of material character, bore upon the vital defensive issues of the case, and the appellant had been diligent in his efforts to secure it and had prospect of obtaining it by reasonable delay.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*