STEEL v. STATE. (No. 4751.)

(Court of Criminal Appeals of Texas. Jan. 16, 1918.)

1. CRIMINAL LAW ⚖➡614(3)—CONTINUANCE—ABSENCE OF WITNESS—DILIGENCE.

The denial of a second continuance on account of the absence of defendant's wife and another witness was not error, where there was a lack of diligence in procuring their attendance.

2. CRIMINAL LAW ⚖➡614(1)—CONTINUANCE—APPLICATION—SOURCE OF TESTIMONY.

A denial of an application for a second continuance was not error, where the application did not state that the testimony could not be procured from any other source, as required by Code Cr. Proc. 1911, art. 609.

3. CRIMINAL LAW ⚖➡614(2)—CONTINUANCE—CUMULATIVE TESTIMONY.

The denial of an application for a second continuance was not error where it was made to secure cumulative testimony.

4. WITNESSES ⚖➡268(1)—CROSS-EXAMINATION—BROWBEATING WITNESS.

In a trial for murder, where a witness for defendant on cross-examination testified that another witness favorable to defendant was present at the homicide, and that he had not left the scene a few minutes before the homicide, the prosecuting attorney's statement that he wanted to give the witness a fair show, that he could prove where such other witness was, that he wanted the witness to swear whether such other witness was there, and that he meant to have the witness indicted if he swore that such other witness was present, was objectionable.

5. CRIMINAL LAW ⚖➡730(1)—HARMLESS ERROR—CROSS-EXAMINATION.

Such objectionable cross-examination was no ground for reversal, where the court told the jury not to pay any attention to the prosecuting attorney's remarks.

6. CRIMINAL LAW ⚖➡658 — ARREST OF WITNESS—REVERSAL.

The fact that a witness was arrested during the trial on a charge of perjury, where the arrest was not made in court or under the direction of the judge, nor in the presence of the jury, did not bring it within the rule requiring a case to be reversed where the court by having a witness arrested and put in custody indicates his view of the testimony.

7. CRIMINAL LAW ⚖➡872 — TIME TAKEN BY JURY FOR DELIBERATION.

In a trial for murder, the fact that the jury brought in a conviction in about 20 minutes would not authorize a reversal.

8. CRIMINAL LAW ⚖➡823(6)—SELF-DEFENSE — INSTRUCTION — CURE BY OTHER INSTRUCTION.

In a trial for murder, a charge on self-defense, objectionable as submitting the issue

---

of actual danger alone, was cured in a special charge at defendant's request fairly submitted the law of apparent danger.

9. HOMICIDE ☞31—INSTRUCTIONS—ISSUES—MANSLAUGHTER.

In a trial for murder, where it appeared that defendant had gone to the house of deceased's father to gamble, that deceased lived there with his wife, that deceased remonstrated with defendant for cursing in the hearing of his wife, and that defendant shot him while he was standing back against a drawer with both hands in his pocket, and where defendant alleged self-defense on the ground that the deceased was trying to get a weapon from the drawer, the issue of manslaughter was not in the case.

10. CRIMINAL LAW ☞1129(3)—APPEAL—SUFFICIENCY OF OBJECTION.

Mention of failure to charge on manslaughter contained in the brief, but not in the bill of exceptions, and reference thereto in the objections to the court's charge, was too general to be considered.

11. HOMICIDE ☞250—MURDER—SUFFICIENCY OF EVIDENCE.

Evidence *held* to sustain a conviction of murder.

Appeal from District Court, Bowie County; H. F. O'Neal, Judge.

Joe Steel was convicted of murder, and he appeals. Affirmed.

Joe Hughes, of Texarkana, for appellant. E. B. Hendricks, Asst. Atty. Gen., for the State.

MORROW, J. Appellant's conviction was for the murder of Burton Wiggins, his punishment being assessed at confinement in the state penitentiary for a term of 99 years.

The killing of deceased by appellant was not controverted, but he sought to justify on the ground of self-defense. The homicide took place at the residence of E. Wiggins, the father of the deceased. The son, Burton Wiggins, and his wife also resided there. All of the parties were negroes. Appellant and some others who were witnesses went to the home of E. Wigggins for the purpose of gambling. The deceased was not one of the party, but was at work at some place in the city, and returned to his home about dinner time. Appellant had been cursing in the house and in the hearing of the wife of deceased, who was in another room. Deceased, learning of the cursing, remonstrated with appellant, and was shot and killed by him.' The version of E. Wiggins, father of deceased, and some of the other state's witnesses, is that the deceased came into the room in which appellant and others were and said, "Men, don't be cursing in there; my wife is in the kitchen," to which appellant replied, "God damn you and your wife, too, you black son of a bitch," deceased replying, "You don't mean to call me a son of a bitch because I asked you not to curse before my wife." Appellant said, "Yes; I do," drew an automatic pistol from his pocket and fired one shot, striking deceased in the breast near the nipple, inflicting a wound from which he died in a very few moments.

This witness, E. Wiggins, claimed that the parties were about five feet apart, the deceased standing with his back to the dresser with both hands in his pocket; that he did not take them out until after he was shot. He said that about the time the shot was fired appellant said, "Get away from that dresser." He also claimed that he (witness) ran, and appellant chased him with his pistol. He claimed:

That the deceased did not speak in an angry manner, did not make any move to get anything, and did not make any move until he fell down. "From the way he acted he did not know that Joe Steel was going to shoot him; nobody wouldn't have knowed it at the time; they wouldn't have thought it."

The wife of deceased gave substantially the same testimony as her father-in-law. The state's witness Holmes testified that in a conversation between appellant and others before deceased came appellant remarked that he bet he would kill somebody before the year was out. We quote from his testimony as follows:

"Burton [deceased] came in—well, Joe was still cursing, and Burton came in there and said to Joe, 'You've got to cut that cursing out and respect my wife and daddy,' and Joe Steel called him a son of a bitch, and when deceased started in the room his father said, 'You go on back; I will attend to everything myself,' and he wouldn't go back, and he came back with both hands in his pocket, just leaning up against the dresser, and he said to Joe, 'You don't mean to curse me for a son of a bitch because I asked you not to curse before my wife,' and Joe shot him, and he turned clean around and fell on his face. Deceased had come to dinner and had walked in there. At the time he was shot he had both hands in his pocket. He walked up to the dresser and backed to the dresser, with both hands in his pocket, and said, 'You don't mean to call me a son of a bitch,' and Joe shot him."

Whether there was a pistol on the premises or in a bureau drawer was a disputed issue; E. Wiggins and deceased's wife testifying that there was none. There was testimony that E. Wiggins made some effort to prevent his son, deceased, from going in the room, and that he (E. Wiggins) had made some contradictory statements. Some of the eyewitnesses for the defendant claimed that the father of the deceased remonstrated with appellant for cursing, and that appellant said he would not do so again; that when deceased came in he walked up to the dresser and pulled one hand out of his pocket and backed up to the dresser; that he did not know whether he was trying to get in the drawer or not. He claimed that when deceased came in he said:

"Let me in there; I will stop that cursing; I will kill him; let me get to that drawer; I will stop him; I will kill him."

Appellant told him twice to get away from the drawer and stay out of it. Another witness for the defendant gave substantially the same testimony as to deceased coming in the room and saying he would kill him, and said that deceased commenced pulling on the

drawer and was in the act of putting his hand in the drawer when appellant shot. This witness Smith said that after the shooting the father of deceased took a pistol off of deceased. We quote from him as follows:

"He goes out of the front door and Joe Steel behind him, and comes around from the back and takes a six-shooter off of this boy, out of the drawer, and comes on the front porch."

The presence of this witness at the time of the homicide was controverted.

Appellant testified that when he was cursing in the house deceased's father told him to stop on account of his son's wife being in the house, and that he (appellant) apologized. E. Wiggins, deceased's father, was called "Big Smokey" or "Smokey," and deceased was called "Little Smokey." We quote from appellant as follows:

"Big Smokey said, 'Joe has started cursing, and I am going to break up the game,' and this boy heads in the middle door, and Smokey said, 'You go back; I will run the house,' and he said, 'No; I ain't going to have nobody cursing over my wife,' and he and his daddy tussled in the door a half a minute, and during the tussle some one knocked on the front door, and it was two women, and when he leaves this door he goes to the dresser drawer, and he said, 'If I get to this dresser drawer, I will stop him; I will kill him,' and after he goes to the door, and there stands Smokey there and Little Smokey over here at the dresser drawer, and here stood Babe Holmes. I knew Babe Holmes and Smokey were good friends, and Babe didn't like me, and that is why I shot. I didn't know whether I hit him; I didn't care whether I hit him; I just wanted to keep him out of the dresser drawer. He made an attempt three times to get in the dresser drawer, and stood there a minute or three minutes after I shot. I could have shot him six times, but I didn't make any attempt to shoot him any more; that is how the trouble was. He said, 'If I get to that dresser drawer, I will stop the son of a bitch or kill him,' and when he got to the dresser drawer he said, 'Joe Steel you don't mean to run over me and my family,' and I said, 'I am not running over your family; I did curse, and I told your daddy I wouldn't do it any more,' and some one said, 'You know you wouldn't let anybody curse over your family like this,' and I said, 'No; because I ain't going to have no such a bunch as this around my family.' When he walked up to this dresser he started to open the drawer, and I looked him so straight in the eye until he kinder checked up, and he asked me did I mean to run over him and his family. He was trying to get in the drawer, and he had it just about that far open; and I knew this Burton negro, I knew he would hurt a fellow, and that is why I wouldn't take any chances. As to whether I thought there was a gun in that drawer: I knew there was one. I mighty near knew there was one in there. I shot because I thought he was going to get a gun to shoot me; that is what he said he was going to get; he said he was going to kill me, and that is all he could get out of there was a gun. I did not try to shoot Big Smokey after that. There were three men in the house that I was afraid would try to hurt me."

[1-3] Appellant sought a second continuance on account of the absence of his wife, Lillie Steel, and Charley Lowe, in which he claimed that his wife would testify that appellant went to the house where the homicide took place about 10 o'clock in the morning and remained there until after the homicide; that the testimony would become material because E. Wiggins had testified on the examining trial that appellant, after going to the house about 10 o'clock, and after stating that he was going to kill a man at that house before night, had left and returned about 20 minutes before the homicide. The court, in qualifying the bill, says this witness did not see the difficulty or any part of it, and her testimony was immaterial in that it was to contradict the witness that it was thought the state might use. From our examination of the statement of the facts we do not find that the state proved by the witness E. Wiggins that the appellant had made the remark mentioned in the application, or that he had left his house between his first arrival there and the homicide. It appears, however, that the appellant introduced part of the testimony of this witness given at the examining trial, to the effect that appellant came back to the house about noon; that on the introduction of this part of the evidence the state introduced the balance, wherein the witness claimed that appellant had said he was going to kill a man in the house before night. The application as to both the witnesses named fails to charge that the testimony cannot be procured from any other source. Aside from that defect, the testimony of the appellant's wife would become material only in the event the state had proved by the witness Wiggins that the appellant had made more than one visit to the house before the homicide. The testimony of the other witness named in the application was to the effect that deceased was in the act of pulling out the dresser drawer to get a pistol when the shot was fired. The application, as above stated, did not declare that this evidence could not be had from any other source, and in fact it was, in substance, cumulative of other testimony given on behalf of defendant by some of his witnesses. There is also a finding of the trial judge in his qualification to the bill that there was a lack of diligence to procure the attendance of the witness. Article 609, C. C. P., provides that this application should state the testimony could not be procured from any other source. Vernon's Crim. Stats. vol. 2, p. 324; Fulkerson v. State, 57 Tex. Cr. R. 80, 121 S. W. 1111. At the same page of Vernon's will be found a number of cases to the effect that it is not error to overrule an application for continuance to secure cumulative testimony. See Bosley v. State, 69 Tex. Cr. R. 100, 153 S. W. 878; Johnson v. State, 55 Tex. Cr. R. 134, 114 S. W. 1178, and other cases listed.

There was an order of the court substituting the indictment in the case. Article 482, C. C. P., authorizes the substitution of the indictment, and provides the procedure therefor. We are unable to discern any departure from this procedure or failure to observe its provisions, pointed out in the bill of exceptions or existing in the record. See Vernon's C. C. P. p. 249 and cases listed.

[4, 5] In the cross-examination of Adam Brown, one of defendant's witnesses, who, among other things, had testified, giving testimony indicating that another witness favorable to appellant named Smith was present and saw the homicide, the prosecuting attorney asked the witness Brown if Smith had not left the scene of the homicide a few minutes before it occurred, to which the witness gave a negative answer. The prosecuting attorney then said:

"I want to give you a fair show; we can prove where he, Mex [Smith], was. I want you to swear positively whether or not Mex was there."

Objection was made that this manner of cross-examination was in the nature of browbeating or bluffing a witness, to which the prosecuting attorney answered that he was not bluffing, but meant to have Brown indicted if he swore that Smith was present. The court told the jury not to pay any attention to the remarks of the attorneys. The witness did swear that Smith was present as shown by the bill, and did not in response to the remarks of the district attorney change or modify his statements so far as the bill shows. The proceeding was not such as ought to have occurred. 40 Cyc. 2517. As disclosed in the bill, however, it does not appear to have been harmful, and consequently not reversible. Huggins v. State, 60 Tex. Cr. R. 214, 131 S. W. 596; Siars v. State, 63 Tex. Cr. R. 567, 140 S. W. 777; and cases cited in Vernon's C. C. P. p. 710.

[6] Complaint is made of the fact that the witness Will Smith was arrested during the trial. An inquiry as to the facts was developed and is made part of the bill, from which it appears that a complaint was made against Will Smith charging him with perjury; that it was not made in court or under the direction of the judge, nor in the presence of the jury, and so far as shown by the bill the jury was not aware of the fact. The circumstances do not bring it within the rule which requires the case to be reversed where the court, by having the witness arrested or put in custody, indicates his view of his testimony.

[7] In his motion for a new trial the appellant complains that the jury did not give sufficient consideration to his case, in that it brought in a verdict in about twenty minutes. The facts relating to the matter are not verified by any bill of exceptions. Assuming them to be correct, however, our attention has been directed to no precedent which would authorize us to reverse the case upon that ground alone.

[8] The court's charge on self-defense is criticized on the ground that it submitted the issue of actual danger alone. This criticism is correct so far as the main charge is concerned, but was cured in a special charge given at the request of appellant, which fairly submitted the law of apparent danger.

[9-11] The issues in the case were murder and self-defense. Manslaughter, we think, was not involved. Ford v. State, 40 Tex. Cr. R. 284, 50 S. W. 350; Dougherty v. State, 59 Tex. Cr. R. 471, 128 S. W. 402; Luster v. State, 63 Tex. Cr. R. 541, 141 S. W. 214, Ann. Cas. 1913D, 1089; Johnson v. State, 74 Tex. Cr. R. 179, 167 S. W. 736; Lamb v. State, 74 Tex. Cr. R. 301, 168 S. W. 534; Lamb v. State, 75 Tex. Cr. R. 75, 169 S. W. 1158; Jackson v. State, 30 Tex. App. 664, 18 S. W. 643; Blount v. State, 58 Tex. Cr. R. 509, 126 S. W. 570; Hardeman v. State, 61 Tex. Cr. R. 113, 133 S. W. 1057. The failure to charge on manslaughter is mentioned in the brief, but not in any bill of exceptions. The reference to it in the objections to the court's charge is of a character held too general. Branch's Ann. P. C. p. 1131, § 2004.

We have carefully reviewed the record, and finding the evidence supporting the state's theory, if believed to be true, sufficient to support the verdict, and no reversible error being committed in the trial, the judgment of the lower court is affirmed.